ORDER RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
 

 WILLIAMS, Chief United States Magistrate Judge.
 

 The following motions are currently before the Court for its consideration: (1) Plaintiff Idaho Mining Association’s Motion for Summary Judgment (Docket # 16), filed March 19,1999; and (2) Defendants’ Motion for Summary Judgment (Docket #27), filed May 10, 1999. On September 1, 1999, the Court conducted a hearing on the pending motions with counsel for all parties appearing and participating. The Court has considered the arguments of counsel and has fully reviewed the legal briefing and other pertinent documents of record and is now prepared to enter its ruling on the pending motions as follows.
 

 I. Background
 

 In the instant action, the Court is asked to determine whether the Environmental Protection Agency (“EPA”) exceeded its authority under the Administrative Procedures Act (“APA”), 5 U.S.C. § 551,
 
 et seq.,
 
 and the Clean Water Act (“CWA” or “Act”), 33 U.S.C. § 1251,
 
 et seq.,
 
 when it promulgated a rule establishing revised water quality standards for three (3) water body segments in Northern Idaho. Plaintiff, Idaho Mining Association, challenges the revised standards and seeks a declaration from this Court that the EPA’s rule-making was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. Plaintiff also seeks an order vacating the challenged rule and remanding the matter back to the EPA for further proceedings in accordance with the requirements of the APA and CWA.
 

 A. The Clean Water Act
 

 The primary objective of the Clean Water Act (“CWA”) is to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters” through the implementation of goals and policies designed to eliminate the discharge of pollutants into these waters. Section 101(a), 33 U.S.C. § 1251(a). To this end, Congress has declared that “wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved.” Section 101(a)(2), 33 U.S.C. § 1251(a)(2). These so-called “fish-able/swimmable” uses are primarily achieved through the implementation of two mechanisms: (1) technology-based requirements, i.e. “effluent limitations guidelines;” and (2) water-quality based requirements, i.e. water quality standards.
 
 See
 
 Sections 301 and 303, 33 U.S.C. §§ 1311 and 1313.
 

 Technology-based requirements impose stringent limitations upon the types and amounts of pollutants which may be discharged into the nation’s waters by point sources.
 
 [1]
 
 Section 301, 33 U.S.C. § 1311. Water quality-based requirements, on the other hand, specify the desired condition of a waterway in terms of the standard (i.e. fishable/swimmable, agricultural, industrial, etc.) to be achieved. Section 303, 33 U.S.C. § 1313. Thus, water quality standards generally consist of three elements: (1) one or more designated uses for the water body at issue; (2) water quality criteria which express the concentrations or levels of pollutants which may be present in the water and still support the designated use(s); and (3) an anti-degradation policy. Section 303(c)(2), 33 U.S.C.
 
 *1081
 
 § 1313(c)(2); Section 303(d)(4)(B), 33 U.S.C. § 1313(d)(4)(B); 40 C.F.R. § 131.3(i). As the United States Supreme Court has explained, water quality standards “supplement effluent limitations ‘so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.’ ”
 
 Arkansas v. Oklahoma,
 
 503 U.S. 91, 101, 112 S.Ct. 1046, 1054, 117 L.Ed.2d 239 (1992) (quoting
 
 EPA v. California ex rel. State Water Resources Control Bd.,
 
 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 2025, n. 12, 48 L.Ed.2d 578 (1976)).
 

 While both effluent limitations guidelines and water quality standards are useful tools in improving the condition of the nation’s waters, neither alone is sufficient to ensure compliance with the requirements of the CWA. Thus, Congress created the National Pollutant Discharge Elimination System (“NPDES”) as a means of enforcing the limitations and standards imposed by the Act. Section 402, 33 U.S.C. § 1342. Under the NPDES, individuals must obtain a permit in order to discharge pollutants into the waters of the United States. Section 301(a), 33 U.S.C. § 1311(a) (prohibiting the discharge of any pollutant by any person except as permitted by certain provisions of the CWA, including section 402). An NPDES permit sets forth certain terms and conditions with which individual dischargers must comply and “serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations ... of the individual discharger .... ”
 
 State Water Resources Control Bd.,
 
 426 U.S. at 205, 96 S.Ct. at 2025.
 

 Under the CWA, individual states are primarily responsible for the prevention, reduction and elimination of pollution of waterways within their boundaries. Section 101(b), 33 U.S.C. § 1251(b). This responsibility carries with it the obligation to promulgate water quality standards consistent with the purposes and requirements of the CWA. Section 303(c), 33 U.S.C. § 1313(c).
 
 [2]
 
 Specifically, section 303(c) of the CWA requires that each state periodically undertake a public review of existing water quality standards and revise and adopt new standards as appropriate. 33 U.S.C. § 1313(c)(1). In adopting and/or revising water quality standards, each state is required to specify the appropriate water uses to be achieved and protected, taking into consideration the particular water body’s “use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.” Section 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.10(a). Furthermore, each state is required to adopt water quality criteria, expressed in terms of numerical values or narrative criteria, to protect the designated use(s). 40 C.F.R. § 131.11.
 

 The CWA does not impose upon states the obligation to designate any particular use(s) for water bodies. At a minimum, however, states must revise their water quality standards to reflect existing uses, i.e. those uses which are actually being attained. 40 C.F.R. § 131.10(i); 40 C.F.R. § 131.10(e). Furthermore, fisha-ble/swimmable uses are favored. Section 101(a)(2), 33 U.S.C. § 1251(a)(2). Thus, where a state fails to designate a water body for fishable/swimmable uses, the state must conduct a use attainability analysis (“UAA”) in accordance with the provisions of the CWA.
 
 [3]
 
 40 C.F.R. § 131.10(j)(l). Conversely, a UAA is not
 
 *1082
 
 required whenever físhable/swimmable uses are designated. 40 C.F.R. § 131.10(k).
 

 Although it is the states’ responsibility to develop and/or revise water quality standards for waters within their boundaries, such new or revised standards must be submitted' to the EPA for approval. Section 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A). The EPA implementing regulations set forth the minimum requirements for water quality standards submissions as follows:
 

 The following elements must be included in each state’s water quality standards submitted to EPA for review:
 

 (a) Use designations consistent with the provisions of Sections 101(a)(2) and 303(c)(2) of the Act.
 

 (b) Methods used and analyses conducted to support water quality standards revisions.
 

 (c) Water quality criteria sufficient to protect the designated uses.
 

 (d) An antidegradation policy consistent with § 131.12.
 

 (e) Certification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law.
 

 (f) General information which will aid the Agency in determining the adequacy of the scientific basis of the standards which do not include the uses specified in Section 101(a)(2) of the Act [i.e. fisha-ble/swimmable uses] as well as information on general policies applicable to State standards which may affect their application and implementation.
 

 40 C.F.R. § 131.6. If the EPA rejects a state’s proposed water quality standards, it must so notify that state within ninety (90) days and specify the changes necessary to meet CWA requirements. Section 303(c)(3), 33 U.S.C. § 1313(c)(3). If, within ninety (90) days after notification, the state fails to make such changes, the EPA is required to “promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved.” Section 303(c)(4)(A), 33 U.S.C. § 1313(c)(4)(A); 40 C.F.R. § 131.22(a). In doing so, the EPA “is subject to the same policies, procedures, analyses, and public participation requirements established for States in [the EPA] regulations.” 40 C.F.R. § 131.22(c).
 

 B. Procedural History
 

 Plaintiff, Idaho Mining Association, is a non-profit corporation whose members include industrial facilities that conduct mining activities in the State of Idaho. Plaintiffs members hold National Pollutant Discharge Elimination System (“NPDES”) permits and are authorized to discharge certain amounts of industrial wastewater to particular waters in Northern Idaho. On October 2, 1998, Plaintiff filed a Complaint in the instant action naming the United States Environmental Protection Agency and the following individuals as defendants: Carol M. Browner, Administrator, U.S. Environmental Protection Agency; and Charles C. Clarke, Regional Administrator, Environmental Protection Agency, Region 10 (hereinafter collectively referred to as “EPA”). In its Complaint, Plaintiff alleges that the EPA failed to comply with the requirements of the APA when it promulgated revised water quality standards for certain Idaho waters in 1997. The revised standards establish new designated uses for certain stream segments in Northern Idaho and impose more stringent water quality criteria to protect the new uses. Plaintiff alleges that the new standards will significantly affect the ability of Plaintiffs members to discharge mining pollutants into the affected waters pursuant to their NPDES permits and will negatively impact the economic viability of the mining industry in Idaho. Plaintiff seeks an order vacating that portion of the EPA rule which establishes the new designated uses on the grounds that the EPA rulemaking as to the revised standards was arbitrary and
 
 *1083
 
 capricious, an abuse of discretion and other-wise not in accordance with the law.
 

 On December 18, 1998, the Idaho Conservation League and the Lands Council (hereinafter collectively referred to as the “Conservation Groups”) filed a Motion to Intervene. (Docket # 8). The Conservation Groups are non-profit organizations which are highly active in seeking to improve Idaho water quality standards and to protect the aquatic life and human uses of Idaho’s rivers, lakes and streams. On April 19, 1999, the Court granted the Conservation Groups’ Motion to Intervene on the grounds that they have a significant interest in defending the improved water quality standards which Plaintiff now challenges. (Docket # 23).
 

 The action is presently before the Court on Plaintiff and Defendants’ cross-motions for summary judgment. The Conservation Groups have not filed a motion for summary judgment but have formally joined in Defendants’ motion,
 
 see
 
 Docket # 32, and have filed a separate brief in support of their position.
 

 C. Factual History
 

 The material facts underlying this matter are not in dispute. On July 11, 1994, the State of Idaho fulfilled its obligations under section 303(c) of the CWA by submitting a complete set of water quality standards to the EPA for review. (IWQS 0784). Almost two years later, on June 25, 1996, the EPA issued an official notification approving Idaho’s 1994 water quality standards with certain exceptions. (IWQS 00021). However, this notification came only after the Conservation Groups filed a citizen suit against the EPA to compel it to comply with its mandatory duties under sections 303(c)(3) and 303(c)(4)(A) of the CWA to formally approve or disapprove Idaho’s proposed water quality standards and, if necessary, to adopt replacement standards for those state standards which it disapproved.
 
 See Idaho Conservation League v. Browner,
 
 968 F.Supp. 546 (W.D.Wash.1997) (hereinafter
 
 “ICL v. Browner
 
 ”).
 

 One group of standards which the EPA disapproved in its June 1996 letter concerned the designation of 53 Idaho stream segments for uses less protective than fish-able/swimmable.
 
 [4]
 
 (IWQS 00024). Specifically, the EPA informed the IDEQ that the following disapproval issue would require immediate state action:
 

 Stream Segments with Specific Use Designations which a,re Inconsistent with Clean Water Act Requirements
 
 EPA disapproves the classification of waters of the State listed in 16.01.02.102 through 16.01.02.160 of the Idaho 1994 Water Quality Standards which do not include uses specified in CWA § 101(a)(2) and the requirements of CWA § 303(b)(2) and 40 C.F.R. § 131.10....
 

 (IWQS 00024). In a separate memorandum, the EPA further explained its disapproval decision as to the classification of waters which did not include uses specified in section 101(a)(2) of the CWA. (IWQS 00027-00030). That memorandum stated in part:
 

 The goals and requirements of the Act, are that wherever attainable, water quality shall provide for the protection and propagation of fish, shellfish, and wildlife and provide for recreation in and on the water. Where the State designates or has designated uses that do not include the uses specified in CWA § 101(a)(2) the federal water quality standards regulation requires States to conduct and submit to EPA a use attainability analysis.
 

 (IWQS 00028).
 

 Having disapproved Idaho’s use designations for the specified stream segments, and consistent with its obligations under
 
 *1084
 
 section 303(c)(3) of the CWA, the EPA informed the IDEQ that it must undertake certain revisions in order to bring Idaho’s 1994 water quality standards in conformity with the purposes and requirements of the CWA. (IWQS 00022). In this respect, the EPA provided the IDEQ with two options, either of which it determined to be an appropriate resolution to remedy the deficient water quality standards:
 

 The State can either a) conduct and submit to EPA acceptable use attainability analyses to justify the existing classification for the above listed water bodies, or b) adopt designated uses for each water body which provides for the protection and propagation of aquatic life and recreation in and on the water where applicable.
 

 (IWQS 00030). However, Idaho failed to undertake either of these revisions within the ninety (90) day time period prescribed by section 303(c)(4)(A) of the CWA. Thus, it became the EPA’s responsibility to “promptly prepare and publish” replacement standards in accordance with the CWA. Section 303(c)(4)(A), 33 U.S.C. § 1313(c)(4)(A); 40 C.F.R. § 131.22(a).
 

 By February, 1997, neither the IDEQ nor the EPA had promulgated new or revised water quality standards for Idaho. Consequently, the Conservation Groups took it upon themselves to seek a court order requiring the EPA to adopt replacement standards in accordance with its duties under section 303(c)(4)(A) of the CWA. On February 20,1997, the presiding judge in
 
 ICL v. Browner,
 
 granted the Conservation Groups’ motion for summary judgment and entered an order directing the EPA to act within sixty (60) days to “promulgate water quality standards for Idaho in accordance with its June 1996 letter of disapproval.”
 
 ICL v. Brouwer,
 
 968 F.Supp. at 549. The court order was subsequently modified to allow the EPA sixty (60) days in which to propose revised standards and ninety (90) days thereafter in which to promulgate a final rule. (IWQS 07842,17843).
 

 On April 28, 1997, the EPA published a proposed rule introducing several tentative revisions to those Idaho water quality standards which the EPA had disapproved in 1996. 62 Fed.Reg. 23,003 (April 28, 1997); (IWQS 07841-07867). Included within the proposed revisions was a new federal use designation establishing aquatic life and recreation uses for the specific water body segments whose use designations EPA had disapproved in 1996. (IWQS 07846). The EPA explained that it had previously disapproved Idaho’s regulations with respect to those waters because, in many cases, the regulations only protected the stream segments for recreation and did not provide any protection for aquatic life.
 
 (Id.).
 
 The EPA determined that Idaho’s failure to adopt water quality standards which provided protection for the fishable component of fishable/swimmable uses was inconsistent with the goals and requirements of the CWA because Idaho had not undertaken a UAA to demonstrate that such uses were unattainable. (IWQS 07844, 07846). Thus, the EPA proposed to promulgate a rule establishing aquatic life and recreation designated uses for the water body segments of concern, unless it was demonstrated to the EPA for a particular water body that such uses were unattainable. (IWQS 07846-07847). In proposing this rule, the EPA expressly stated that it was relying on a rebuttable presumption implicit in its regulations at 40 C.F.R. Part 131 that fishable/swimma-ble uses are attainable unless the uses have been shown by a UAA to be unattainable. (IWQS 07844, 07846, 07853). In addition, the EPA specifically proposed that 35 of the 53 stream segments be designated for cold water biota use because “[t]he majority of native Idaho fish are classified as cold water species and the presence of the species occurs throughout the entire State.” (IWQS 07845, 07847).
 

 The EPA held a public hearing and took comments on all aspects of the proposed rule for a period of thirty (30) days. (IWQS 04857). Many commentators com
 
 *1085
 
 plained that the comment period was too short.
 
 (Id.).
 
 However, in responding to the comments, the EPA explained that none of the commentators had demonstrated that the thirty (30) day comment period was inadequate as a matter of law.
 
 (Id.).
 
 Moreover, the EPA noted that an extension of the comment period was not feasible because the EPA was under a strict court-ordered deadline to promulgate the final rule by July 31, 1997.
 
 (Id.).
 
 In addition to raising procedural concerns, commentators also voiced general objections to the EPA’s cold water biota use designations for the water bodies at issue. (IWQS 04860). However, after reviewing the information submitted, the EPA concluded that the data did not demonstrate that the aquatic life uses — and specifically, the cold water biota uses — could not be attained.
 

 On July 31, 1997, the EPA published the final rule establishing cold water biota designated uses for several Idaho waterways, including the South Fork of the Coeur d’Alene River and two of its tributaries, Canyon Creek and Shields Gulch (hereinafter collectively referred to as the “affected waters”).
 
 [5]
 

 See
 
 40 C.F.R. § 131.33(b). In doing so, the EPA again stated that it was “relying on the rebuttable presumption implicit in the CWA and EPA’s regulations at 40 C.F.R. part 131, that in the absence of data to the contrary, ‘fishable’ uses are attainable.” (IWQS 04860).
 

 In promulgating the final rule, the EPA made clear that a discharger with an existing NPDES permit is not subject to permit conditions reflecting the heightened water quality standards for the affected waters until such time as the discharger’s permit is renewed. (IWQS 04872). However, the EPA recognized that additional data material to the attainability of the cold water biota uses might become available in the future. (IWQS 04871, 07853). Thus, the EPA rule also established a procedure by which an individual dischar-ger can obtain a variance from the water quality standards by demonstrating that the cold water biota use is unattainable due to the presence of certain chemical or physical conditions, or because compliance with the fishable use criteria would cause “substantial and widespread economic and social impact.” 40 C.F.R. § 131.33(d)(3). Pursuant to the variance procedure, application for the water quality standards variance is timed to coincide with the NPDES permit renewal process. 40 C.F.R. § 131.33(d)(4). Thus, an individual NPDES regulated discharger who establishes that the cold water biota use is unattainable for a particular water body will escape the more stringent permit limits imposed by cold water biota use designation. However, the variance applies only to the to the permit holder requesting the variance; the underlying cold water biota use designation otherwise remains in effect. 40 C.F.R. § 131.33(d)(1).
 

 II. Legal Standards
 

 A. Summary Judgment Standard
 

 When reviewing a motion for summary judgment, the proper inquiry is whether “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R. Civ.P. 56(c) (1993). A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that “there is an absence of evidence to support the non-moving party’s case.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support
 
 *1086
 
 the non-moving party’s case, the burden shifts to the party resisting the motion who “must set forth specific facts showing that there is a genuine issue for trial.”
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is not enough for the [non-moving] party to “rest on mere allegations of denials of his pleadings.”
 
 Id.
 
 Genuine factual issues must exist that “can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Id.
 
 at 250, 106 S.Ct. 2505.
 

 “When determining if a genuine factual issue ... exists, ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability.”
 
 Id.
 
 at 249-250, 106 S.Ct. 2505. “The mere existence of a scintilla of evidence in support of the [non-moving party’s] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].”
 
 Id.
 

 The Ninth Circuit has consistently applied the standard for granting summary judgment.
 
 Musick v. Burke,
 
 913 F.2d 1390 (9th Cir.1990);
 
 Pelletier v. Federal Home Loan Bank,
 
 968 F.2d 865 (9th Cir. 1992);
 
 Bieghler v. Kleppe,
 
 633 F.2d 531 (9th Cir.1980).
 

 In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.
 
 Aronsen v. Crown Zellerbach,
 
 662 F.2d 584, 591 (9th Cir.1981).
 

 The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a “genuine issue of material fact.”
 
 Hanon v. Dataproducts Corp.,
 
 976 F.2d 497 (9th Cir.1992).
 

 In order to withstand a motion for summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party’s claim implausible.
 

 British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,
 
 882 F.2d 371 (9th Cir.1989).
 

 B. Administrative Review Standard
 

 In reviewing an agency’s action overall, the Court follows the provisions of the Administrative Procedures Act (“APA”), 5 U.S.C. § 551,
 
 et seq.
 
 Specifically section 706(2)(A) of the APA provides that the reviewing court shall “hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law .... ” The United States Supreme Court has held that the ultimate standard of review under this provision is narrow, and that a court is not entitled to substitute its judgment for that, of the agency’s.
 
 Motor Vehicle Manufacturers Assn. v. State Farm Mut. Ins. Co.,
 
 463 U.S. 29, 31, 103 S.Ct. 2856, 2860-2861, 77 L.Ed.2d 443 (1983). At the same time, however, the reviewing court must conduct a review that is “searching and careful.”
 
 Mt. Graham Red Squirrel v. Espy,
 
 986 F.2d 1568, 1571 (9th Cir.1993).
 

 In order for an agency’s decision to be upheld, a court must find that “evidence before the agency provided a rational and ample basis for its decision,” otherwise the decision could be held to be arbitrary and capricious.
 
 Northwest Motorcycle Assn. v. United States Dept. of Agriculture,
 
 18 F.3d 1468, 1471 (9th Cir.1994). An agency’s own interpretation of its own regulations controls “unless it is plainly erroneous or inconsistent with the regulations.”
 
 Nevada Land Action Assn. v. U.S. Forest Service, 8
 
 F.3d 713 (9th Cir.1993). With
 
 *1087
 
 this standard in mind, the Court will determine whether the EPA’s decision to promulgate a rule establishing aquatic life designated uses for three water bodies in Northern Idaho based on a rebuttable presumption that such a uses are attainable was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.
 

 III. Cross-Motions for Summary Judgment
 

 Plaintiff and Defendants each move for summary judgment as to the validity of that portion of the EPA rule which establishes cold water biota use designations for the South Fork Coeur d’Alene River, Canyon Creek and Shields Gulch.
 
 See
 
 40 C.F.R. § 131.33(b). Plaintiff contends that the rule was based upon inadequate data and analysis and that the EPA impermissi-bly created and relied upon a rebuttable presumption that the designated aquatic life uses are attainable in the affected waters. Plaintiff also alleges that the EPA’s rulemaking violated the APA in that the EPA failed to consider relevant factors in determining whether aquatic life uses were in fact attainable. Defendants and Inter-venors, on the other hand, assert that the rebuttable presumption of attainability is a permissible interpretation of existing regulations governing water quality standards. Furthermore, Defendants and Tntervenors argue that the EPA rule was neither arbitrary and capricious nor contrary to law because a cold water biota designation for each of the three water bodies at issue is consistent with the purposes and requirements of the CWA. The Court will take up each of these arguments in turn.
 

 A. Whether the EPA’s Reliance Upon a Rebuttable Presumption of Attainability to Support the Aquatic Life Use Designation was Impermissible
 

 Plaintiff argues that the EPA acted unlawfully when it relied upon a rebuttable presumption of attainability to support a cold water biota use designation for each of the three affected waters. Plaintiff advances several arguments as to why it is entitled to judgment as a matter of law as to this issue. In the first instance, Plaintiff contends that neither the CWA nor the EPA’s implementing regulations at 40 C.F.R. Part 131 authorize a presumption that aquatic life uses are attainable unless and until such uses are proved unattainable. Additionally, Plaintiff asserts that the EPA’s adoption of the rebuttable presumption was actually the creation of a substantive rule for which the EPA failed to provide the appropriate notice and comment period as required by the APA.
 
 See 5
 
 U.S.C. § 553. Plaintiff also maintains that the EPA’s application of the rebuttable presumption was unlawful because there were insufficient facts on which to base the aquatic life use designation and because there was no meaningful opportunity to rebut the presumption. Finally, Plaintiff asserts that the EPA exceeded its statutory authority in adopting a rebuttable presumption of attainability.
 

 In response, and in support of its own motion for summary judgment, the EPA argues that its reliance on the rebuttable presumption of aquatic life use attainability was a reasonable interpretation of the EPA’s own water quality standards regulations. Specifically, EPA contends that its regulations have always required that waters be designated for fishable/swimmable uses unless a use attainability analysis affirmatively demonstrates that fisha-ble/swimmable uses cannot be sustained. Furthermore, the EPA asserts that even if the fishable/swimmable presumption were a new interpretation of EPA regulations, it is a reasonable interpretation that was developed after the notice and comment period required by the APA. Lastly, the EPA contends that its reliance on the rebuttable presumption was not unlawful because the EPA regulations which it has interpreted as requiring fishable/swimmable use designations reasonably implement the CWA.
 

 The Intervenors have also submitted a brief in opposition to Plaintiff’s motion for
 
 *1088
 
 summary judgment and supporting the EPA’s position. In it, they argue that the EPA was under both a statutory and judicial mandate to promulgate aquatic life use designations for the affected waters.
 

 1. Whether the EPA Reasonably Interpreted Its Own Regulations as Requiring a Rebuttable Presumption in Favor of Aquatic Life Use Designations
 

 It is undisputed that one of the primary goals of the CWA is to achieve water quality that provides for fishable/swimma-ble uses wherever such uses are attainable. Section 101(a)(2), 38 U.S.C. § 1251(a)(2). It is further undisputed that when establishing new or revised water quality standards, states are required to adopt standards that “protect the public health or welfare, enhance the quality of water and serve the purposes” of the CWA. Section 303(c)(2)(A), 33 U-S-C. § 1313(c)(2)(A). While these provisions plainly express a preference for fishable/swimmable use designations, all parties agree that the CWA does not itself create a rebuttable presumption that such uses are always attainable. Rather, the CWA directs states to consider numerous factors when adopting water quality standards, including the water body’s “use and value for public water supplies, propagation of fish and wildlife, recreational purposes,” and other purposes enumerated by the Act.
 
 Id. See also,
 
 40 C.F.R. § 131.10(a). Nevertheless, the EPA contends that a rebuttable presumption of aquatic fife attainability is clearly supported by EPA regulations implementing the CWA.
 

 The regulatory provisions upon which the EPA relies are codified at 40 C.F.R. §§ 131.10(j) and (k). Specifically, section 131.10(j) provides that a state must conduct a use attainability analysis anytime the state fails to designate a water body for fishable/swimmable uses. Section 131.10(k), on the other hand, provides that a state is not required to conduct a use attainability analysis whenever the state designates fishable/swimmable uses. According to the EPA, the net effect of these two provisions is to require that water quality standards provide for fisha-ble/swimmable uses unless those uses have been shown by a use attainability analysis to be unattainable. This position is entirely consistent with the position taken by the EPA throughout the course of the rule-making process. (IWQS 04860, 07844, 07846, 07853). In fact, the preamble to the proposed rule contains perhaps the most explicit statement to this effect. There, the EPA explained:
 

 EPA’s regulations at 40 C.F.R. Part 131 interpret and implement [sections 101(a)(2) and 303(c)(2)(A) of the CWA] through a requirement that water quality standards provide for fisha-ble/swimmable uses unless those uses have been shown to be unattainable, effectively creating a rebuttable presumption of attainability. Unless that presumption has been rebutted, a default designation of fishable/swimmable beneficial uses apply.
 

 (IWQS 07844). Throughout the administrative process, the EPA consistently relied on the above interpretation of its own regulations to support the challenged rule.
 

 It is well-settled that an agency’s reasonable interpretation of its own regulations is entitled to substantial deference.
 
 Arkansas v. Oklahoma,
 
 503 U.S. 91, 112, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (holding that a court sitting in review of an agency action should give “due regard” to the agency’s interpretation of its own regulations);
 
 Udall v. Tallman,
 
 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (‘When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.”);
 
 Western States Petroleum Assn. v. Environmental Protection Agency,
 
 87 F.3d 280, 283 (9th Cir. 1996) (“[W]e must give deference to the EPA’s interpretation of its own regulations, if its interpretation is not unreasonable.”). Accordingly, the threshold inquiry
 
 *1089
 
 to be resolved on summary judgment is whether the EPA reasonably interpreted its water quality standards regulations as requiring a rebuttable presumption in favor of aquatic life use designations. Plaintiff contends that it did not.
 

 Plaintiff argues that the EPA regulations at 40 C.F.R. Part 131 cannot reasonably be interpreted to authorize a re-buttable presumption of attainability. In support of its position, Plaintiff places much emphasis on the fact that the EPA has “admitted” that this is the first time it has ever relied on such a presumption in promulgating federal water quality standards. However, as the EPA points out, the EPA has merely admitted that this is the first time it has ever used the phrase “rebuttable presumption” in connection with a water quality standards promulgation. (IMA’s Answer, Docket #7, U 23). In fact, the water quality standards on which the EPA bases its interpretation have actually been in existence since 1983 and have always required that waters be designated for fishable/swimmable uses unless a UAA demonstrates that fishable/swimmable uses cannot be attained.
 
 See
 
 48 Fed. Reg. 51400, 51405, 51409 (Nov. 8, 1983), codified at 40 C.F.R. §§ 131.10(j) and (k).
 

 The EPA contends that while it has never before used the term “rebuttable presumption,” it has relied upon the concept in previous rulemaking. Specifically, the EPA draws the Court’s attention to a federal -water quality standard which it promulgated for the State of Arizona in 1996.
 
 See
 
 61 Fed.Reg. 20686, 20687-88 (May 7, 1996). As in the present case, Arizona had previously submitted its proposed water quality standard revisions to the EPA for review. However, the EPA disapproved the proposed standards on the grounds that Arizona failed to include a “fish consumption” use for certain water bodies which it already designated for aquatic and wildlife use. The Arizona Department of Environmental Quality subsequently submitted UAAs in support of its decision not to include fish consumption uses. However, the EPA was under a court order to promulgate the regulation and stated that it did not have sufficient time to review the data submitted. Consequently, the EPA promulgated a default fish consumption use designation for the water bodies at issue. The EPA explained that it would withdraw the designation if, after completing its review of the UAAs, it determined that the fish consumption use was not feasible.
 

 In responding to comments to the Arizona promulgation, the EPA relied upon its designated use regulations and explained its rationale as follows:
 

 EPA regulations regarding use designations provide that a State “must conduct a use attainability analysis as described in 40 C.F.R. § 131.3(g) whenever the state designates or has designated uses that do not include the uses specified in section 101(a)(2) of the Act.” 40 C.F.R. § 131.10(j)(l). Section 101(a)(2) of the CWA provides that water quality “shall provide for the protection of fish, shellfish, wildlife and recreation in and on the water”, and, in EPA’s view, the “protection” of fish, shellfish, and recreation necessarily includes ensuring that fish are not so contaminated that they are unhealthful for human consumption. Nonetheless, the State had failed to include designated uses that would protect such aquatic life for purposes of human consumption, or to perform a UAA demonstrating that this use was not attainable. EPA ... therefore appropriately concluded that the State’s standards were not “consistent with” the goals of the CWA.
 

 61 Fed.Reg. 20686, 20688 (May 7, 1996). It is true, as Plaintiff contends, that the Arizona rulemaking did not involve a presumption that aquatic life uses were attainable. However, the quoted language above clearly evidences the EPA’s consistently held position, based on its 1983 regulations, that fishable/swimmable uses
 
 *1090
 
 must be designated unless a UAA demonstrates that such uses are not feasible.
 

 Despite the foregoing, Plaintiff contends that the EPA’s “presumptive use” interpretation is contrary to its own regulations. In particular, Plaintiff points to 40 C.F.R. § 131.10(d), a water quality standards regulation which it contends explicitly establishes a presumption regarding use attainability. That regulation states:
 

 At a minimum, uses are deemed attainable if they can be achieved by the imposition of effluent limits required under section 301(b) and 306 of the Act and cost effective and reasonable best management practices for nonpoint source control.
 

 Id.
 
 Plaintiff argues that this regulation explicitly creates a presumption that uses are not attainable unless they can be achieved by the imposition of technology-based point source controls and best management practices for nonpoint source controls. Thus, under Plaintiffs interpretation, the EPA would have been required to find that the imposition of point source and nonpoint source pollution controls on the affected waters would result in the attainment of fishable/swimmable uses before it actually established fishable/swimmable use designations for those waters. Because the EPA made no such finding, Plaintiff contends that the EPA was without authorization to presumptively deem fishable/swimmable uses attainable. Additionally, Plaintiff argues that because the EPA
 
 explicitly
 
 created a presumption of attainability in 40 C.F.R. § 131.10(d), it is precluded from relying on a presumption of aquatic life attainability which it now purports to be
 
 implicit
 
 in other regulations.
 
 See Oregon Natural Resources Council, Inc. v. Kantor,
 
 99 F.3d 334, 339 (9th Cir.1996) (quoting
 
 Estate of Bell v. Commissioner,
 
 928 F.2d 901, 904 (9th Cir. 1991) (“Congress is presumed to act intentionally and purposely when it includes language in one section but omits it in another.”)). Unfortunately, Plaintiffs argument not only misconstrues the applicability of 40 C.F.R. § 131.10(d), but it also completely ignores other pertinent water quality standards regulations.
 

 Although not entirely clear on its face, section 131.10(d) is not a generally applicable provision defining the requirements of attainability. Rather, it is a provision which applies in the context of a UAA to prohibit states from downgrading existing designated uses when those uses can be attained by imposing pollution controls in the form of effluent limits for point sources and cost-effective and reasonable best management practices for nonpoint sources.
 
 See
 
 47 Fed.Reg. 49234, 49236 (Oct. 29, 1982). Thus, while section 131.10(d) establishes the parameters by which states are allowed to make unattain-ability determinations, it does not impose upon states the obligation to conduct a UAA every time the state establishes a new beneficial use designation. On the contrary, 40 C.F.R. § 131.10(k) expressly provides that a state is
 
 not
 
 required to conduct a UAA so long as the state adopts water quality standards that protect fisha-ble/swimmable uses in and on the water. This is a point even Plaintiff concedes.
 

 While Plaintiff expressly acknowledges that subsection (k) of 40 C.F.R. § 131.10 authorizes states to establish fisha-ble/swimmable use designations without performing a UAA, it nevertheless argues that the EPA does not have that same authority. However, as both Defendants and the Intervenors point out, this argument carries little force. Because Idaho failed to correct the deficiencies in its 1994 water quality standards, the EPA was under a mandatory duty pursuant to section 303(c) of the CWA to promptly adopt replacement standards for those standards which it had disapproved. Section 303(c)(4)(A); 33 U.S.C. § 1313(c)(4)(A); 40 C.F.R. § 131.22(a).
 
 See also, Arkansas v. Oklahoma,
 
 503 U.S. 91, 101, 112 S.Ct. 1046, 1054, 117 L.Ed.2d 239 (1992);
 
 Idaho Conservation League, Inc. v. Russell,
 
 946 F.2d 717, 720 (9th Cir.1991);
 
 ICL v. Browner,
 
 968 F.Supp. at 549. In doing so,
 
 *1091
 
 the EPA was “subject to the same policies, procedures, analyses, and public participation requirements established for States in [the EPA] regulations.” 40 C.F.R. § 131.22(c). Thus, despite Plaintiffs assertions to the contrary, section 131.10(k) authorized the EPA to establish aquatic life uses for the affected waters without performing a IJAA.
 

 Plaintiff next argues that the EPA’s presumptive use interpretation cannot be reconciled with the directive of 40 C.F.R. § 131.10(a) that states establish designated uses “tak[ing] into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation.”
 
 Id.
 
 Plaintiff correctly argues that this provision neither mandates a particular use nor creates a presumption that aquatic life uses are attainable. However, the Court must agree with Defendants that section 131.10(a) is neither more nor less operative than other EPA regulations, i.e. sections 131.10(j) and (k), that do call for fisha-ble/swimmable use designations absent a IJAA.
 

 In a final argument, Plaintiff contends that the rebuttable presumption upon which EPA relied to promulgate the challenged rule was not an interpretation of existing regulations but was rather the creation of a substantive rule in violation of the notice and comment requirements of the APA.
 
 See
 
 5 U.S.C. § 553 (providing that general notice of proposed rulemaking must be published in the Federal Register and that interested persons must be given the opportunity to participate in the rule-making through the submission of comments). Alternatively, Plaintiff argues that even if the rebuttable presumption could be characterized as an interpretive rule or general statement of policy exempt from the APA rulemaking requirements, the EPA was still obligated to present evidence and reasoning supporting the aquatic life use designation in this ease.
 
 See Pacific Gas and Electric Company v. Federal Power Commission,
 
 506 F.2d 33, 38 (D.C.Cir.1974) (“When [an] agency applies [a] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.”). Plaintiff argues that instead of presenting such evidence, the EPA adopted the rebuttable presumption for the first time in connection with the challenged rule solely as a means of avoiding its obligation to conduct the appropriate analyses to determine whether aquatic life uses are attainable in the affected waters.
 
 [6]
 
 Thus, Plaintiff submits that the challenged rule must be vacated as arbitrary and capricious.
 

 Defendants take issue with Plaintiffs assertions on two grounds. In the first instance, Defendants contend that the EPA’s reliance on the rebuttable presumption in favor of fishable/swimmable uses is merely an interpretation of existing regulations and not the creation of a substantive rule. Again, Defendants acknowledge that they have never before used the term “rebutta-ble presumption” in connection with a rule-making. However, Defendants argue that the use of the term in this instance does not change the substance of the EPA’s existing regulatory requirements.
 

 In support of their position, Defendants rely on
 
 Puerto Rico Aqueduct and Sewer Authority v. U.S. EPA (“PRASA”),
 
 35 F.3d 600 (1st Cir.1994). In
 
 PRASA,
 
 the petitioner sought an NPDES permit modification. The EPA denied the request and ultimately rejected the petitioner’s request for an evidentiary hearing on the basis that the petitioner had failed to present a “genuine issue of material fact” with respect to the modification request. On ap
 
 *1092
 
 peal, the petitioner argued that the EPA had impermissibly adopted a Rule 56 standard with respect to the showing required of a party seeking an evidentiary hearing without affording the petitioner adequate notice or the opportunity to respond. The First Circuit rejected the petitioner’s argument, finding that the standard imposed by the EPA regulation was the “functional equivalent” of that required to overcome a Rule 56 motion.
 
 Id.
 
 at 608. The Court reasoned as follows:
 

 We think that EPA’s regulations lawfully can be read to incorporate this binary test, featuring genuineness and materiality. What is more, we refuse to attach talismanic significance to the absence of the stock phrase “genuine issue of material fact.” The reference found in 40 C.F.R. § 124.75(a)(1) to “material” issues of “relevant” fact achieves precisely the same end. In practice, courts and agencies regularly use a variéty of terms to describe the two pillars of summary judgment.
 

 We hasten to add that, despite this linguistic equivalency, explicitly drawing a connection to Rule 56 accomplishes three things. First, it provides a common vocabulary, easily understandable by litigants, lawyers, and adjudicators. Second, it introduces into an agency’s jurisprudence a ready-made ensemble of decisional precedents associated with Rule 56 .... Third, it carries with it certain expectations, conditioned by everyday experience in the federal courts, about the kind and degree of evidence deemed necessary to create a genuine dispute over a material fact.
 

 Id.
 
 at 605 (internal citations omitted). Thus, the court held that in applying the Rule 56 terminology, the EPA had reasonably interpreted its own regulations governing requests for evidentiary hearings.
 
 Id.
 
 at 609.
 

 In this case, the Court agrees with Defendants that the EPA’s use of the phrase “rebuttable presumption” did not work any change to the substantive requirements of the EPA’s existing regulations at 40 C.F.R. § 131.10(j) and (k). As Defendants point out, Plaintiff was aware of the showing required by these regulations. Even in the proposed rule, the EPA consistently stated that these provisions “effectively creat[ed] a rebuttable presumption of attainability.” (IWQS 07844, 07846). Thus, as in
 
 PRASA,
 
 the only effect the new terminology had on the rulemaking was to provide a “common vocabulary” under which the EPA and commentators could operate.
 

 Furthermore, even assuming that the rebuttable presumption in favor of fisha-ble/swimmable uses was a new interpretation of the EPA’s regulations, it was a reasonable interpretation that was made after the notice and comment period required by the APA. As the administrative record reveals, Defendants published notice of the proposed rule, including the EPA’s reliance on the rebuttable presumption, in the
 
 Federal Register
 
 on April 28, 1997, three months before the final rule was promulgated.
 
 See
 
 62 Fed.Reg. 23003 (April 28, 1997); (IWQS 07841). Defendants also took comments as to the proposed rule for a period of thirty (30) days. (IWQS 04857). While the comment period was shorter than generally allowed, the EPA was under a court ordered deadline, and it cannot be said that a thirty (30) day comment period was a per se violation of the APA.
 

 Based on the foregoing, the Court concludes that the EPA reasonably interpreted its regulations at 40 C.F.R. § 131.10(j) and (k) as requiring an aquatic life use designation unless a UAA demonstrates that aquatic life uses are unattainable. Although the regulations do not explicitly contain the phrase “rebuttable presumption,” the Court finds that it was neither arbitrary and capricious, an abuse of discretion, nor contrary to law for the EPA to construe them as such.
 

 2. Whether the EPA Exceeded Its Statutory Authority Under the CWA
 

 Having determined that the EPA reasonably interpreted its own regulations at
 
 *1093
 
 40 C.F.R. § 131.10(j) and (k) as requiring a rebuttable presumption in favor of fisha-ble/swimmable uses, the next question before the Court is whether the EPA exceeded its statutory authority in promulgating those regulations. As was previously noted, the EPA promulgated sections 131.10(j) and (k) in 1983. As such, the Court’s initial inquiry must focus on whether Plaintiff’s challenge to the regulations is time-barred.
 
 [7]
 

 As Defendants point out, 28 U.S.C. § 2401(a) imposes a six-year statute of limitations for actions brought under the APA.
 
 See also, Wind River Mining Corporation v. United States,
 
 946 F.2d 710, 713 (9th Cir.1991) (“LA] suit for review of an agency decision, commenced by filing a civil complaint in federal court, fits the explicit terms of section 2401(a).”). That statute requires that the action be filed “within six years after the right of action first accrues.” 28 U.S.C. § 2401(a). It is generally held that the right of action on a procedural challenge to an agency’s decision accrues on the date the decision is rendered.
 
 Wind River,
 
 946 F.2d at 715 (“The government’s interest in finality outweighs a late-comer’s desire to protest the agency’s action as a matter of policy or procedure.”);
 
 Shiny Rock Mining Corporation v. United States,
 
 906 F.2d 1362, 1364 (9th Cir.1990) (“Publication in the Federal Register is legally sufficient notice to all interested or affected person regardless of actual knowledge or hardship resulting from ignorance.”). However, the Ninth Circuit has expressly held that “a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency’s application of that decision to the specific challenger.”
 
 Wind River,
 
 946 F.2d at 716.
 

 In this case, Plaintiff has alleged that the EPA exceeded its statutory authority under the CWA in adopting the presumptive use interpretation. Because the presumptive use interpretation was not applied to Plaintiff until 1997, Plaintiffs challenge to that interpretation, and thus to the EPA’s 1983 regulations, is well within the six-year limitation period prescribed by 28 U.S.C. § 2401(a) and
 
 Wind River.
 
 Accordingly, the Court finds that Plaintiffs challenge to the 1983 regulations is not time-barred. This having been said, the Court will now focus on the parties’ substantive positions regarding the EPA’s statutory authority.
 

 Plaintiff argues that the EPA exceeded its statutory authority under the CWA when it adopted a rebuttable presumption in favor of fishable/swimmable use designations. Plaintiff advances essentially two arguments in support of this position. First, Plaintiff argues that the plain language of the CWA does not authorize the EPA to adopt rebuttable presumptions of use attainability in CWA rulemakings. Second, Plaintiff argues that even if the EPA did have statutory authority to adopt the rebuttable presumption, it exceeded that authority because: (1) there is no sound factual connection between the facts giving rise to the aquatic life presumption and the presumed facts; and (2) the presumption, as applied, was actually irrebuttable.
 

 In response, Defendants argue that the EPA did not exceed its statutory authority under the CWA. Specifically, Defendants contend that the EPA regulations on which the presumptive use interpretation is based reasonably implement the applicable provisions of the CWA. Defendants further contend that the CWA is subject to multiple interpretations and that the EPA’s interpretation is therefore entitled to substantial deference. Finally, Defendants argue that Plaintiffs reliance on cases involving different types of rebutta-
 
 *1094
 
 ble presumptions is misplaced in light of the fact that those cases do not address statutory interpretations.
 

 a. Whether the CWA Authorizes a Rebuttable Presumption in Favor of Fishable/Swimmable Uses
 

 The threshold issue before the Court is whether the EPA was authorized under the CWA to promulgate regulations which effectively created a rebuttable presumption in favor of físhable/swimmable uses. Resolution of this issue will require the Court to determine whether the applicable language of the statute is plain and unambiguous or whether the language is subject to multiple interpretations. The parties take entirely different positions as to this issue.
 

 It is a well-settled canon of statutory construction that the plain and unambiguous language of a statute controls its meaning.
 
 See United States v. James,
 
 478 U.S. 597, 603, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (quoting
 
 Blue Chip Stamps v. Manor Drug Stores,
 
 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (POWELL, J„ concurring)) (“The starting point in statutory interpretation is ‘the language of the statute itself.’ ”);
 
 American Tobacco Co. v. Patterson,
 
 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (“[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used.”);
 
 Caminetti v. United States,
 
 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) (“Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.”). Where the language of the statute is plain and not subject to more than one interpretation, “the sole function of the courts is to enforce it according to its terms.”
 
 Caminetti
 
 242 U.S. at 484, 37 S.Ct. at 194. Moreover, “[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.”
 
 I.N.S. v. Cardoza-Fonseca,
 
 480 U.S. 421, 448, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987).
 

 It is true that when confronted with a problem of statutory construction, courts are generally required to show “great deference to the interpretation given the statute by the officer or agency charged with its administration.”
 
 Udall v. Tallman,
 
 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Nevertheless, “when Congress’s intent is clear, the courts, not the agency, are charged with the basic responsibility for statutory interpretation. A contrary agency interpretation is entitled to no deference.”
 
 Pacific Rivers Council v. Thomas,
 
 30 F.3d 1050, 1054 (9th Cir. 1994).
 
 See also, Chevron, U.S.A., Inc. v. Natural Resources Defense Council,
 
 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (“If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.”). However, when Congress’ intent is not clear, courts must defer to the agency’s reasonable interpretation of the statute:
 

 If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
 

 Chevron,
 
 467 U.S. at 843, 104 S.Ct. at 2781-82.
 

 In this case, Plaintiff argues that the plain language of section 303(c)(2)(A) of the CWA prohibits “default” use designations such as the presumptive aquatic life use designation relied upon by the EPA in this case. Section 303(c)(2)(A) provides:
 

 
 *1095
 
 Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.
 

 33 U.S.C. § 1313(c)(2)(A). As Plaintiff points out, this provision does not establish a “presumptive use” for waters of the United States. Instead, it directs the states to consider a variety of factors when establishing water quality standards, including the waters’ use and value for recreational, agricultural, industrial and aquatic life uses. Plaintiff contends that in drafting this provision, Congress expressly left it to the discretion of the each individual state to determine the appropriate use designation for each of its water bodies. Plaintiff also argues that the EPA’s presumptive use interpretation “essentially reads out of the statute the
 
 selection
 
 authority that Congress vested exclusively in the states under this section.” (IMA’s Reply Brief, Docket # 43, p. 7). Plaintiff contends that had Congress intended that all waters of the United States be designated as fishable/swimmable, it would have expressly provided for it in Section 303(c)(2)(A).
 

 In support of its position, Plaintiff relies on
 
 Associated Industries v. Train,
 
 9 Env’t Rep. Cases 1561 (N.D.Ala.l976), an unreported district court case out of the Northern District of Alabama. The
 
 Train
 
 case also involved a challenge by industry petitioners to an EPA rule that established a federal use designation for state waters. However, in
 
 Train,
 
 the issue was whether the EPA exceeded its authority under section 303(a)(1) of the CWA in disapproving and promulgating revised water quality standards for the state of Alabama when the State’s standards were consistent with the requirements of the Federal Water Pollution Control Act of 1965 (“FWPCA”), the predecessor to the CWA.
 
 [8]
 

 Under section 10(c)(3) of the FWPCA, “state standards [were] required to take into account a body of water’s ‘use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other legitimate uses.’ 33 U.S.G.A. § 1160(c)(3).”
 
 Train,
 
 9 Env’t Rep. Cases at 1564. Alabama had previously submitted state water quality standards consistent with these requirements, and the standards were approved by the EPA on September 19, 1972. However, the EPA subsequently disapproved the standards as being inconsistent with the requirements of the 1972 amendments. The EPA then promulgated a rule establishing a “blanket minimum use classification of fish and wildlife for all interstate and intrastate waters of Alabama.”
 
 Train,
 
 9 Env’t Rep. Cases at 1566. The industry petitioners challenged the rule in federal district court, alleging that the EPA had acted
 
 *1096
 
 arbitrarily and capriciously in disapproving Alabama’s state water quality standards and in promulgating the blanket minimum federal use designation.
 

 The
 
 Train
 
 court ultimately invalidated the EPA rule, noting that the FWPCA did not permit the EPA to establish a blanket minimum fish and wildlife designation.
 
 Id.
 
 at 1567. The court reasoned that “[i]f Congress had intended that no waters be classified below ‘fish and wildlife,’ certainly it would have said so and expressly eliminated consideration of the use of water for agricultural, industrial, and navigation purposes.”
 
 Id.
 
 The court further held that the EPA exceeded its authority under the 1972 amendments in disapproving and promulgating new water quality standards for the State of Alabama and expressly rejected the EPA’s assertion that it had done so on the basis of a national policy requiring the minimum use classification of fish and wildlife to protect the uses set forth in the FWPCA.
 
 Id.
 
 at 1568.
 

 Plaintiff argues that the reasoning employed in the
 
 Train
 
 decision applies with equal force in this case. However, as Defendants point out, Plaintiffs reliance on
 
 Train
 
 is actually somewhat misplaced. The
 
 Train
 
 court specifically held that the EPA had exceeded its statutory authority under sections 303(a)(1) and (a)(2) of the CWA. It was not at all concerned with section 303(c)(4) of the current statute which expressly authorizes the EPA to review state water quality standards and to disapprove and promulgate new standards if the state standards are inadequate. Again, despite Plaintiffs persistent assertions to the contrary, the EPA was required to promulgate new water quality standards for the state of Idaho in this case.
 
 See
 
 33 U.S.C. § 1313(c)(4)(A); 40 C.F.R. § 131.22(a);
 
 ICL v. Browner,
 
 968 F.Supp. at 549. Thus, the EPA did not contravene “the delicate balance of power congressionally arbitrated between the federal government and the states under the CWA” as contended by Plaintiff.
 
 (See
 
 IMA’s Reply Brief, Docket #43, p. 5).
 

 Defendants argue that the
 
 Train
 
 case is also distinguishable from the case at bar because the
 
 Train
 
 court never addressed the EPA’s authority to establish federal use designations under the current statute. Specifically, Defendant directs the Court’s attention to those provisions of the current CWA which provide that water quality standards should be such as to serve the purposes of the Act, including the achievement of fishable/swimmable uses wherever those uses are attainable.
 
 See
 
 33 U.S.C. §§ 1251(a)(2) and 1313(c)(2)(A). Furthermore, Defendants argue that the
 
 Train
 
 case is inapplicable here because the “fish and wildlife” use designation at issue in that case was a “blanket minimum” designation and was, therefore, actually an irre-buttable presumption. Finally, Defendant argues that the analyses employed by the court in
 
 Train
 
 is inadequate in light of subsequent decisions, such as the Supreme Court’s decision in
 
 Chevron, supra,
 
 which specifically address the appropriate standard to be employed when reviewing an agency’s interpretation of a statute which it administers. The Court agrees.
 

 According to the Supreme Court in
 
 Chevron,
 
 courts must undertake the following two-step analysis when reviewing an agency’s construction of a statute which it administers:
 

 First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
 

 
 *1097
 

 Chevron,
 
 467 U.S. at 842-43, 104 S.Ct. at 2781-82 (internal footnotes omitted). In order to determine that the agency has permissibly construed the statute, “[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.”
 
 Id.
 
 at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citations omitted). Rather, if the agency’s interpretation “represents a reasonable accommodation of conflicting policies that were committed to the agency’s care by the statute,” the interpretation should not be disturbed.
 
 Id.
 
 at 845, 104 S.Ct. at 2782 (quoting
 
 United States v. Shimer,
 
 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961)).
 
 See also, Central Arizona Water Conservation District v. U.S. EPA
 
 990 F.2d 1531, 1541 (9th Cir. 1993).
 

 The Ninth Circuit’s decision in
 
 Central Atizona Water Conservation District, supra,,
 
 is particularly instructive with respect to the deference to be accorded an agency’s interpretation of a statute it administers when the statute itself contains conflicting policies or factors. In that case, the Ninth Circuit upheld an PIPA rule which was based on an interpretation of the term “reasonable progress” as that term is used in section 7491 of the Clean Air Act.
 
 Id.
 
 at 1541-42. In doing so, the court noted that “Congress chose not to define the term ‘reasonable progress,’ but instead set forth several factors for the agency to consider.”
 
 Id.
 
 at 1542. In light of the fact that Congress did not assign specific weight to the factors, the Court held that the statute was ambiguous and that the EPA’s permissible construction of the statute was therefore entitled to deference.
 
 Id.
 
 at 1543 (citing
 
 Chevron,
 
 467 U.S. at 843, 104 S.Ct. at 2782).
 

 In this case, the Court agrees with Defendants that Congress has not directly spoken to the precise question at issue, i.e. “what showing should be required for a water body to avoid (or receive) a particular designated use.” (EPA’s Opening Brief, Docket #27, pp. 20-21). Instead, Section 303(c)(2)(A) of the CWA merely provides a list of competing factors/uses to be considered when establishing water quality standards without providing any specific guidance as to how those factors should be weighed or balanced against one another. In light of this ambiguity, the Court must proceed to the second step of the
 
 Chevron
 
 inquiry and determine whether the EPA’s presumptive fishable/swimmable use interpretation is a permissible construction of the statute. For the following reasons, the Court finds that it is.
 

 In promulgating its 1983 regulations and the challenged rule, the EPA did not unreasonably exclude any of the factors contained in section 303(c)(2)(A) from consideration. Instead, it merely exercised its discretion to balance those factors in favor of a fishable/swimmable use designation unless a UAA demonstrates that such uses are not attainable. In the Court’s view, the EPA’s presumptive use interpretation is consistent with Congress’ express directive that water quality standards be such as to “protect the public health or welfare, enhance the quality of water and serve the purposes of [the CWA].” Section 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A). Undeniably, one of the over-arching purposes of the CWA is to achieve fisha-ble/swimmable uses wherever attainable. Section 101(a)(2), 33 U.S.C. § 1251(a)(2). Thus, although Congress recognized that the achievement of fishable/swimmable uses will not always be possible, it clearly indicated an intent that states move toward more protective water quality standards to preserve the nation’s waters for human uses as well as for aquatic life. The EPA’s regulations at 40 C.F.R. § 131.10(j) and (k), and the rebuttable presumption stemming therefrom, are plainly consonant with this intent and represent a “reasonable accommodation of conflicting policies that were committed to the agency’s care by” section 303(c)(2)(A) of the
 
 *1098
 
 CWA.
 
 [9]
 

 Chevron,
 
 467 U.S. at 845, 104 S.Ct. at 2783 (quoting
 
 Shimer,
 
 367 U.S. at 383, 81 S.Ct. at 1560). Accordingly, the Court finds that the EPA’s presumptive use interpretation is a permissible construction of the statute and is therefore' entitled to deference from this Court.
 

 b. Whether the EPA Unlawfully Relied Upon the Rebuttable Presumption
 

 Plaintiff argues that even if the EPA did have statutory authority to adopt the rebuttable presumption at issue, the EPA exceeded that authority when it applied the presumption in this case. Specifically, Plaintiff asserts that the presumption was unlawful because there was no sound factual connection between the facts giving rise to the presumption and the presumed facts. Furthermore Plaintiff contends that there was no meaningful opportunity to rebut the presumption. Thus, Plaintiff argues that the EPA’s presumptive use interpretation cannot stand.
 

 With respect to its first assertion, Plaintiff primarily relies on
 
 Holland Livestock Ranch v. U.S.,
 
 714 F.2d 90, 92 (9th Cir. 1983), for the proposition that an agency presumption is not valid unless a “ ‘sound factual connection’ exists between the facts giving rise to the presumption and the facts then presumed.” Plaintiff argues that in this case, that “sound factual connection” is totally lacking. Specifically, Plaintiff contends that the EPA’s aquatic life use presumption is premised on nothing more than a “finding that where there is surface water then aquatic life uses are attainable.” (IMA’s Memorandum in Support of Motion for Summary Judgment, Docket # 17, p. 17) (footnote omitted). Plaintiff again argues that the EPA created the presumption merely as a means of avoiding its obligation to conduct the required analyses to support the aquatic life use designation. Thus, Plaintiff submits that the presumption is ultra vires and should be invalidated by this Court.
 
 See Holland Livestock,
 
 714 F.2d at 92 (“Administrative presumptions should not replace proof needlessly.”);
 
 Atchison, Topeka & Santa Fe Ry. Co. v. ICC,
 
 580 F.2d 623, 629 (D.C.Cir.1978) (“The Commission is not free, as the legislature may be, to formulate a presumption that derives rationality from policy considerations of its own choosing ----”);
 
 Pacific Gas,
 
 506 F.2d at 38-39 (“An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.”).
 

 . In response, Defendants argue that Plaintiffs reliance on
 
 Holland Livestock,
 
 etc. is misplaced. As Defendants point out, most of the cases cited by Plaintiff involve evidentiary presumptions rather than regulatory presumptions such as the presumption relied upon by the EPA in this case. Defendants argue that the rebuttable presumption of fishable/swimmable attainability is not the sort of presumption in which one fact implies the other. Rather, Defendants contend that the rebuttable presumption it is a regulatory scheme designed to obtain or avoid a particular regulatory outcome. Defendants cite several cases in which such regulatory presumptions have been upheld. See
 
 e.g., Downer v. United States ex rel. Dept. of Agriculture,
 
 97 F.3d 999, 1005 (8th Cir. 1996);
 
 Bersani v. Robichaud,
 
 850 F.2d 36, 39 (2d Cir.1988). Furthermore, Defendants maintain that the rebuttable pre
 
 *1099
 
 sumption is merely an interpretation of existing regulations and that the Court’s analysis should therefore by guided by
 
 Chevron, supra.
 

 Again, the Court agrees with Defendants’ position as to this issue. Contrary to Plaintiffs assertions, the rebuttable presumption on which the EPA relied in promulgating the challenged rule was not a new or novel regulatory requirement created by the EPA specifically for the purposes of the 1997 rulemaking. In fact, as has been previously discussed, the EPA actually adopted the rebuttable presumption in favor of fishable/swimmable uses in 1983 with the promulgation of its regulations at 40 C.F.R. § 131.100') and (k).
 
 See
 
 discussion at Section II.A.1.,
 
 supra.
 
 Thus, unlike the presumptions in the cases cited by Plaintiff, the rebuttable presumption in this case came about as a direct result of the EPA’s statutory authority to develop rules that reasonably implement the CWA. Furthermore, the rebuttable presumption of fishable/swimmable attainability is not, as Plaintiff contends, an evidentiary presumption that replaces proof needlessly; for individual states are always given the opportunity to submit evidence in the form of a UAA demonstrating that a particular water body is not capable of attaining fish-able/swimmable uses.
 
 Cf. Holland Livestock,
 
 714 F.2d at 92 (invalidating agency presumption, that cattle with unrestricted access to public lands have in fact trespassed on the public lands, where agency attempted to use the presumption as the sole evidence to establish a claim of trespass). Rather, it is an interpretive rule designed to further the policies of the CWA by providing for fishable/swimmable use designations unless a UAA affirmatively demonstrates that such uses cannot be attained. Insofar as the rule represents a permissible construction of the CWA and a reasonable accommodation of the conflicting policies contained therein, the EPA’s statutory interpretation is entitled to deference from this Court.
 
 Chevron,
 
 467 U.S. at 844-45, 104 S.Ct. at 2782-83.
 

 Plaintiff next argues that the EPA’s reliance on the aquatic life presumption was unlawful because the EPA provided the interested public no meaningful opportunity to rebut the presumption in an adjudicatory hearing as required by the APA.
 
 See generally,
 
 5 U.S.C. §§ 553 and 556. However, Plaintiffs argument once again ignores the fact that the presumption was not adopted for the first time in connection with the 1997 rulemaking but was instead an interpretation of EPA’s existing regulations. The APA clearly exempts from its formal rulemaking requirements “interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.” 5 U.S.C. § 553(b)(A). In this case, the Court has already determined that the rebuttable presumption of fishable/swimmable attainability was merely an interpretive rule. Therefore, no hearing was required. Moreover, the EPA did publish notice of the proposed rule in the
 
 Federal Register
 
 and gave the public an opportunity to rebut the presumption during the thirty (30) day comment period that followed. So long as the presumption remained rebuttable, it cannot be said that the EPA violated the rulemaking requirements set forth in the APA.
 
 See Ryder Truck Lines, Inc. v. United States,
 
 716 F.2d 1369, 1377-78 (11th Cir.1983) (holding that the use of rebuttable presumptions which leave agency free to exercise its discretion on a case-by-case basis “does not reasonably transform a statement of policy into a binding norm” subject to the rulemaking requirements of the APA). Accordingly, the Court finds that the EPA’s use of the rebuttable presumption was not an unlawful exercise of its administrative authority in this case.
 

 B. Whether the EPA’s Determination that the Presumption had not been Adequately Rebutted was Arbitrary and Capricious
 

 Having determined that the EPA properly relied upon a rebuttable presumption of attainability, the final question facing
 
 *1100
 
 the Court is whether the EPA arbitrarily and capriciously applied the presumption in promulgating the challenged rule. In order to make this determination, the Court must evaluate the data which the EPA had at its disposal and decide whether the EPA reasonably determined that the data was insufficient to rebut the presumption of aquatic life attainability for each of the affected waters. In evaluating the data, the Court must keep in mind the regulations on which the rebuttable presumption is based. Those regulations provide that a state is not required to conduct a UAA if the state establishes water quality standards that designate fisha-ble/swimmable uses. 40 C.F.R. § 131.10(k). However, a state must conduct a UAA if the state fails to designate físhable/swimmable uses. 40 C.F.R. § 131.10(j). Thus, the presumption of físhable/swimmable attainability will be rebutted only when UAA — a scientific assessment of physical, chemical, biological and economic factors affecting attainment of the use — demonstrates that such uses are not attainable. '
 
 See
 
 40 C.F.R. § 131.3(g). With this standard in mind, the Court will now turn to the parties arguments regarding the sufficiency of the data on which the EPA relied.
 

 In promulgating the challenged rule, the EPA relied on data from several different sources, including: (1) a 1995 Surface Water Quality Report for the Coeur d’Alene Basin (the “Ridolfi Report”) (IWQS 01185-01583); (2) the results of a fish population survey performed by the Idaho Department of Fish and Game (IWQS — 969-00966); (3) the results of a biological monitoring study performed by the IDEQ in September, 1992 (IWQS 01013-01023); (4) an Economic Analysis (IWQS 04912-04945); and (5) public comments (IWQS 04883). The Court will address general challenges to EPA’s rulemaking before focusing on the data and arguments relevant to each water body at issue in this case.
 

 1. Arguments Common to More than One Water Body
 

 In addition to challenging the sufficiency of the EPA rule based on the specific biological, physical and chemical characteristics of each water body at issue, Plaintiff also raises some general arguments as to the overall sufficiency of the EPA’s rule-making. As a preliminary matter, Plaintiff contends that the EPA was under a heightened evidentiary burden in proposing the water quality standards at issue in this case because it had previously approved Idaho’s water quality standards which did not contain the aquatic life uses which the EPA now contends are presumptively attainable.
 
 See Western States Petroleum Association v. Environmental Protection Agency,
 
 87 F.3d 280, 283 (9th Cir.1996) (“[I]f the EPA has abused its discretion in failing to follow its own prior standards, then we need not defer to the EPA’s anomalous interpretation.”). However, what Plaintiff fails to recognize is that the EPA’s prior approval of Idaho’s water quality standards occurred in 1980, three (3) years before the EPA promulgated the regulations on which the rebuttable presumption of físhable/swimmable attainability is based. Thus, despite Plaintiffs assertion to the contrary, the EPA did not take an indefensible “about face” as to this issue. Furthermore, nothing in section 303(c)(4)(B) requires the EPA to shoulder a heightened burden of proof when establishing revised standards for state standards which it has disapproved. Rather, that provision merely gives the EPA authority to prepare and publish revised standards in any case whether the EPA determines that such standards are necessary to meet the requirements of the CWA. 33 U.S.C. § 1313(c)(4)(B).
 

 Plaintiff also argues that the EPA rule-making was arbitrary and capricious because the EPA failed to consider several relevant factors in promulgating the challenged rule. Plaintiff advances three general arguments in support of its position. First, Plaintiff argues that the EPA failed
 
 *1101
 
 to adequately evaluate whether the imposition of pollution controls would achieve the new aquatic life standard. Additionally, Plaintiff contends that the EPA’s cost analysis was inadequate. Finally, Plaintiff asserts that the EPA arbitrarily failed to consider the adoption of site-specific criteria in connection with the rule. The Court will address each of the Plaintiffs arguments in turn.
 

 a. The Adequacy of the EPA’s Consideration of the Effects of Pollution Controls
 

 Plaintiff argues that one of the relevant factors the EPA failed to evaluate in promulgating the challenged rule is whether the imposition of pollution controls would result in the attainment of the new standards. EPA regulations at 40 C.F.R. § 131.10(d) provide that “uses are deemed attainable if they can be achieved by the imposition of effluent limits ... and cost-effective and reasonable best management practices for nonpoint source control.” Plaintiff argues that pursuant to this provision, the EPA was required to evaluate whether the imposition of such technology-based controls and cost-effective best management practices would enable the affected waters to achieve the new water quality standards. Plaintiff contends that in failing to make this determination, the EPA did not consider “an important aspect of the problem,” and that the challenged rale is therefore arbitrary and capricious.
 
 Motor Vehicle Mfrs. Assn. v. State Farm Mutual Automobile Insurance Co.,
 
 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (“Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem .... ”).
 

 In the Court’s view, this argument merely repeats the argument made by Plaintiff with respect to whether the EPA reasonably interpreted its regulations as requiring a rebuttable presumption in favor of fishable/swimmable use attainability.
 
 See
 
 Section III.A.1. at p. 1090,
 
 supra.
 
 As noted above, the Court agrees with Defendants that 40 C.F.R. § 131.10(d) does not require a state (or, in this case, the EPA), to evaluate technology-based requirements and cost-effective best management practices each time it establishes a new beneficial use designation for a particular water body. Rather, the purpose of section 131.10(d) is to keep states from using a UAA to downgrade a particular use when that use can be achieved through the imposition of technology-based limits.
 
 See
 
 47 Fed.Reg. 49234, 49236 (Oct. 29,1982).
 

 In this case, the EPA, standing in the State of Idaho’s shoes, was not required to conduct a UAA to justify the fisha-ble/swimmable use designations for the affected waters. 40 C.F.R. §§ 131.10(k) and 131.22. Consequently, the EPA had no obligation under section 131.10(d) to determine whether the imposition of pollution controls would result in the attainment of the new water quality standards. Accordingly, its failure to do so can be deemed neither arbitrary and capricious nor an abuse of discretion.
 

 b. The Adequacy of the EPA’s Cost Analysis
 

 Plaintiff next argues that the challenged rule is arbitrary and capricious because the EPA failed to conduct an adequate cost analysis before establishing fishable/swimmable use designations for the affected waters. Specifically, Plaintiff argues that the EPA’s cost estimate bears no relationship to the actual costs associated with attaining the new standards because the EPA never evaluated whether the fishable/swimmable uses could be achieved through the imposition of technology-based pollution controls for point sources and cost-effective best management practices for non-point sources. Thus, according to Plaintiff, the EPA’s cost analysis is nothing more than “fanciful” and is therefore entitled to no deference from this Court.
 
 See American Iron and Steel Institute v. EPA,
 
 115 F.3d 979,
 
 *1102
 
 997 (D.C.Cir.1997) (holding that EPA’s failure to adequately address cost-justification for elimination of certain mixing zones in CWA rule was arbitrary and capricious). For the following reasons, the Court disagrees.
 

 In the first instance, Plaintiffs entire argument is premised on the incorrect assumption that the EPA was required to undertake a comprehensive cost analysis to justify the establishment of the heightened water quality standards for the affected waters. Despite Plaintiffs assertions to the contrary, the EPA’s regulations do not require states to assess the economic impacts of attaining a particular use every time the state revises its water quality standards. Rather, the regulations merely provide that economic factors may be an integral component of a UAA in instances where the state seeks to include within its standards use designations that do not include fishable/swimmable uses. 40 C.F.R. §§ 131.10(g)(6) and 131.10®.
 
 See also 48
 
 Fed.Reg. 51409, 51410 (Nov. 8, 1983) (stating that a UAA should “include, where appropriate, an analysis of the economic impacts of attaining a use consistent with or more stringent than the Section 101(a)(2) [fishable/swimmable] goals of the Act.”). In this case, the EPA did establish fishable/swimmable use designations for the affected waters. As such, it had no obligation to conduct a UAA demonstrating the economic feasibility of attaining those uses. 40 C.F.R. § 131.10(k).
 

 Defendants concede that the EPA would have been required to consider any economic data offered during the comment period to determine whether such data demonstrated that fishable/swimmable uses were unattainable in the affected waters. However, while several commentators did raise general concerns about the economic viability of attaining the new uses, (IWQS 04908-04911), the administrative record is completely devoid of any evidence that any member of the commenting public actually submitted economic data demonstrating that the uses were in fact unattainable. Thus, there was no competing economic analysis available for the EPA to review.
 

 Finally, although the EPA was not required to undertake a cost analysis to justify the new fishable/swimmable use designations for the affected waters, the administrative record reveals that it nevertheless did so in order to comply with the directive of Executive Order 12866 that federal agencies determine whether a particular regulatory action is “significant” and therefore, subject to review by the Office of Management and Budget.
 
 [10]
 
 (IWQS 04872, 04917). Section 10 of Executive Order 12866 specifically provides that the order:
 

 is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable, at law or equity by a party against the United States, its agencies or instru-mentalities, its officers or employees, or any other person.
 

 The Ninth Circuit has held that the use of such language in an Executive Order demonstrates that any actions taken by an agency to comply with the order are not subject to judicial review.
 
 Cal-Almond, Inc. v. United States Department of Agriculture,
 
 14 F.3d 429, 445 (9th Cir.1993) (citing
 
 Michigan v. Thomas,
 
 805 F.2d 176, 187 (6th Cir.1986)). Thus, this Court has no authority to review the merits of Plaintiffs challenge to the substance of the EPA’s cost analysis in this case.
 

 c. Whether the EPA’s Failure to Adopt Site-Specific Criteria was Arbitrary and Capricious
 

 The final issue raised by Plaintiff with respect to the overall sufficiency of the
 
 *1103
 
 EPA rulemaking concerns the failure of the EPA to consider the adoption of site-specific criteria in connection with the challenged rule. Plaintiff relies primarily on the preamble to the EPA’s 1982 proposed regulations for the proposition that “[e]very change in use designations must always be accompanied by consideration of the need for a change in criteria.” 47 Fed.Reg. 49234, 49244 (Oct. 29, 1982). However, as Defendants point out, Plaintiff’s reliance on this provision is misplaced; for the quoted language actually pertains to generally applicable water quality criteria and not to site-specific criteria as Plaintiff suggests.
 

 The EPA recognizes that there are instances in which designated uses may be achieved and protected by criteria less stringent than generally applicable water quality criteria.
 
 See
 
 47 PAd.Reg. at 49238 (“There are water bodies that support the designated uses even though the Section 304(a) numerical criteria included in the state’s standard are exceeded.”). Thus, the EPA promulgated 40 C.F.R. § 131.11(b)(l)(ii) to allow states to modify water quality criteria where the state determines that water conditions are acceptable for the designated use even though the generally applicable criteria are exceeded. 47 Fed.Reg. at 49238. The development of such site-specific water quality criteria is simply one method of ensuring that local conditions are taken into account while still protecting the designated use.
 
 [11]
 

 Id.
 

 Contrary to Plaintiffs assertions, neither the CWA nor the EPA’s regulations at 40 C.F.R. part 131 require states to consider the adoption of site-specific criteria every time the state designates a water body for a new beneficial use. In fact, the EPA’s regulations and 1994
 
 Water Quality Standards Handbook
 
 make clear that the adoption of site-specific criteria is a state option, not a requirement. 40 C.F.R. § 131.11(b)(l)(ii); 47 Fed.Reg. at 49238-49240; Appendix, Docket # 30, Exhibit H:
 
 Water Quality Standards Handbook
 
 § 3.7.2, p. 3-40. Thus, the Court agrees with Defendants that the EPA, standing in the State’s shoes, was not required to consider the adoption of site-specific criteria in this case.
 
 [12]
 

 2. The Affected Waters
 

 In a final argument, Plaintiff contends that the EPA improperly determined that the rebuttable presumption of fishable/swimmable attainability had not been rebutted with respect to each of the three affected waters. Specifically, Plaintiff argues that the EPA had before it no biological, physical or chemical data demonstrating that the aquatic life uses could be attained. Plaintiff submits that in the absence of such technical and scientific data supporting the aquatic life use designation, the EPA rule establishing cold wa
 
 *1104
 
 ter biota uses for the three affected waters was arbitrary and capricious.
 
 [13]
 

 Defendants initially respond by arguing that the EPA had no affirmative duty to conduct a UAA to support the new aquatic life designations. However, Defendants acknowledge that the EPA was required to consider the data submitted by commentators so long as that data would support a UAA. Defendants argue that in this case, the data submitted was not sufficient to support a UAA. Thus, Defendants assert that the EPA appropriately determined that the rebuttable presumption of aquatic life use attainability had not been rebutted for any of the affected waters.
 

 a. South Fork Coeur d’Alene River
 

 The South Fork of the Coeur d’Alene River (“South Fork”) has been impacted by “nearly a century of floodplain destruction, stream channel alteration, and toxic mine waste dumping.” (IWQS 00970). Most mining activity in the Coeur d’Alene Basin has been within this watershed. (IWQS 01198). According to the Ridolfi Report, the South Fork exhibits significant exceedances of ambient water quality criteria. (IWQS 01198). In particular, the Ridolfi Report indicates that the total concentrations of cadium, lead and zinc in the South Fork significantly exceed applicable water quality criteria in all five reaches of the watershed, almost all of the time. (IWQS 01198-01202). Despite these high concentrations of metals, the results of fish population surveys and biological monitoring studies indicate that several species of trout and macroinvertibrates exist at a number of locations in the South Fork. (IWQS 00970-00977); (IWQS 01013-01023). In fact, based on the results of its 1992 study, the IDEQ believed that the South Fork was “fully supporting cold water biota and salmonid spawning.” (IWQS 01014). Furthermore, the studies indicated that the physical habitat characteristics of the South Fork are suitable for trout. (IWQS 01016).
 

 Plaintiff argues that the above data was insufficient to support a cold water biota use designation for the South Fork. In particular, Plaintiff asserts the EPA ignored relevant chemical data which established that the ambient water quality in the South Fork exceeded the applicable criteria by “orders of magnitude.” (IMA’s Memorandum in Support of Summary Judgment, Docket # 17, p. 23). Plaintiff contends that this data alone was sufficient to rebut the presumption that fishable uses are attainable in the South Fork. In support of its position, Plaintiff points to the EPA’s statement in the proposed rule that “[i]f EPA were to find that significant exceedances of water quality criteria (in terms of relative magnitude above the applicable criteria, duration of exceedance above the criteria, and the number and type of pollutants) has occurred, then an upgrade of designated uses might not be appropriate.” (IWQS 07854). Apparently, Plaintiff construes this statement to mean that the presumption of attainability will be automatically rebutted upon a showing that the water body at issue exhibits significant exceedances of water quality criteria. However, as Defendants point out, Plaintiffs interpretation of the statement ignores other factors which must be considered in evaluating use attainability.
 

 Throughout the rulemaking, the EPA made clear that “an appropriate evaluation of use attainability should consider physical, biological, and chemical indicators.”
 
 *1105
 
 (IWQS 07854). Defendants argue that the biological assessment of the South Fork clearly indicated that cold water biota uses were already being attained. (IWQS 01014). In light of the fact that the EPA’s regulations at 40 C.F.R. § 131.10(i) require states to revise their water quality standards to reflect uses which are actually being attained, Defendants argue that it would have been clear error for the EPA not to have designated the South Fork for cold water biota uses.
 

 There is some dispute between the parties as to whether the presence of aquatic life in the South Fork was actually sufficient to constitute an existing use, i.e. a use that was actually being attained. Plaintiff argues that the limited number of cold water biota found in certain areas of the South Fork does not mean that such uses have been “attained” throughout all reaches of the stream segment. Plaintiff relies on the discussion of aquatic life uses contained in the EPA’s
 
 Water Quality Standards Handbook (“Handbook
 
 ”) to support this proposition.
 
 See
 
 Appendix, Docket #30, Exhibit H:
 
 Water Quality Standards Handbook,
 
 p. 4-5 (“[Wlhile sustaining a small coldwater fish population, a stream does not support an existing use of a ‘coldwater fishery.’ ”). However, as Defendants point out, the
 
 Handbook
 
 merely makes a distinction between stable fish populations and small marginal populations that are “artifacts.”
 
 See Id.
 
 Based on the information and data obtained from the IDEQ, the EPA concluded that a stable cold water fish population existed in the South Fork such that the cold water biota uses were actually being attained. (IWQS 04860). The Court agrees with Defendants that this scientific determination is entitled to substantial deference.
 
 [14]
 

 See Baltimore Gas and Electric Co. v. Natural Resources Defense Council,
 
 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (“When examining [an agency’s] scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.”).
 

 Having carefully reviewed the administrative record, the Court finds that the EPA appropriately determined that the presumption of aquatic life attainability had not been rebutted with respect to the South Fork. The biological data available to the EPA during the rulemaking clearly supported the EPA’s determination that cold water biota uses were already being attained in that water body. (IWQS 00970-00977); (IWQS 01013-01023). Therefore, it was neither arbitrary and capricious nor an abuse of discretion for the EPA to designate the South Fork for cold water biota uses.
 

 b. Canyon Creek
 

 The administrative record contains data on the upper and lower portions or reaches of Canyon Creek. The upper segment of Canyon Creek is located above historical mining activity. The lower portion of Canyon Creek is below historic mining activity and exhibits significant exceedances of toxic loading from metals (cadium, lead and zinc) much or all of the time. (IWQS 01199-01202). In biological monitoring studies, the IDEQ found that the physical habitat of Canyon Creek “consisted of plunge pools and pocket water suitable for trout rearing” along the entire length of Canyon Creek. (IWQS 01017). However, the IDEQ did not actually observe any fish present in the water in the lower segment.
 
 (Id.).
 
 Thus, the EPA had before it no biological data indicating that cold water biota uses were actually being attained in the lower segment or reach of Canyon
 
 *1106
 
 Creek. Nevertheless, the EPA designated the lower reach of Canyon Creek for cold water biota uses. In doing so, EPA noted that it “did not receive information from any commentators which would indicate that cold water biota is unattainable is [sic] this water body segment.” (IWQS 04860).
 

 Plaintiff argues that the EPA acted arbitrarily and capriciously in designating Canyon Creek for cold water biota uses absent any evidence that such uses could actually be attained in those waters. Plaintiff accuses the EPA of engaging in “standardless rulemaking” and argues that the cold water biota use designation as to this water body affirmatively demonstrates the irrebuttability of the EPA’s presumption. However, Defendants argue that the EPA’s decision was justified for,two reasons. First, Defendants argue that there was no biological or physical data indicating that aquatic life uses were not attainable in Canyon Creek. Second, Defendants argue that it was reasonable for the EPA to designate Canyon Creek for cold water biota uses because: (1) the upper reaches of the same stream segment already support aquatic life, and (2) Canyon Creek exhibits essentially the same physical and chemical characteristics as the South Fork.
 

 It is true that there were no fish present in the portion of Canyon Creek at issue on the day IDEQ conducted its biological monitoring survey. (IWQS 01017). However, the administrative record establishes that a separate survey conducted in the upper reaches of Canyon Creek (above mining impact) revealed the existence of two fish species, Westslope cutthroat trout and sculpins.
 
 (Id.).
 
 Furthermore, the chemical and physical data at the .EPA’s disposal indicated that the lower portion of Canyon Creek exhibits similar contaminant levels and physical habitat characteristics, i.e. plunge pools and pocket water suitable for trout rearing, as are exhibited in the South Fork. (IWQS 01017, 01199-01202). In light of the fact that the South Fork and upper portions of Canyon Creek are supporting aquatic life, the Court agrees with Defendants that it was not unreasonable for the EPA to conclude that such uses might also be attainable in the lower portion of Canyon Creek at issue in this case. Therefore, the Court finds that the EPA’s determination that the aquatic life use presumption had not been rebutted with respect to Canyon Creek was neither arbitrary and capricious nor an abuse of discretion.
 

 c. Shields Gulch
 
 [15]
 

 There is very little data in the administrative record regarding Shields Gulch. In fact, the only information in the record establishes that Shields Gulch was dry on the day the IDEQ attempted to sample it. (IWQS 03421). The EPA had before it no other biological, chemical or physical data concerning the suitability of Shields Gulch for cold water biota uses.
 

 Plaintiff argues that it was patently arbitrary and capricious for the EPA to designate Shields Gulch for cold water biota uses in the absence of any evidence that such uses could be attained. However, Defendants take the opposite position and argue that there was no evidence of record to rebut the presumption that fisha-ble/swimmable uses could be attained in this water body. Furthermore, Defendants argue that the fact that Shields Gulch was dry on the day the IDEQ attempted to sample it does not preclude a finding that fishable/swimmable uses, and
 
 *1107
 
 cold water biota uses in particular, are attainable at other times of the year.
 
 See
 
 Appendix, Docket # 80, Exhibit H:
 
 Idaho Water Quality Standards Handbook,
 
 p. 2-6 (“EPA recognizes seasonal uses in the Water Quality Standards Regulation.”).
 

 The Court has been particularly troubled by the EPA’s designation of Shields Gulch for cold water biota uses. The Court recognizes that the EPA was not required to affirmatively gather and evaluate biological, physical and chemical evidence to justify the aquatic life use designation. However, the EPA was required to consider any relevant data it had before it during the rulemaking process to determine whether the presumption of aquatic life attainability had been rebutted. In this case, the Court agrees with Plaintiff that all of the data, or lack thereof, pointed to the conclusion that cold water biota uses are not attainable in Shields Gulch, at least as the record now stands.
 

 All parties agree that Shields Gulch has been designated by the State of Idaho as a stream segment or “water” to which to which water quality standards apply.
 
 See
 
 IDAPA 16.01.02.110.01.cc. However, this designation is immaterial to the issue of whether there is actually water in Shields Gulch capable of sustaining aquatic life uses. In fact, the only data of record indicates that Shields Gulch was dry on the day of assessment (IWQS 03421); and Defendants have been unable to point to a single citation in the administrative record to support their assertion that water flows in Shields Gulch for even part of the year. Furthermore, even assuming that Shields Gulch does experience seasonal water flow, there is no evidence in the record as to how many months of the year the water flows, the rate of flow, the ambient water quality or the suitability of the water for fish and other aquatic species.
 

 Based upon the foregoing, the Court finds that the EPA abused its discretion when it designated Shields Gulch for cold water biota uses. In light of the fact that the only data before the EPA indicated that there was no water in the stream segment to support aquatic life uses, it was arbitrary and capricious for the EPA to have determined that the presumption of fishable/swimmable use attainability had not been rebutted for this particular stream segment. Therefore, that portion of the EPA rule designating Shields Gulch for cold water biota uses is vacated and remanded to the EPA for further consideration.
 

 IV. Conclusion
 

 Based upon the foregoing, the Court concludes that the EPA permissibly relied upon a rebuttable presumption of fisha-ble/swimmable use attainability in promulgating the challenged rule. The use of the rebuttable presumption in favor of fisha-ble/swimmable uses was not a new and unauthorized interpretation of the CWA but was instead a reasonable interpretation of the EPA’s existing regulations at 40 C.F.R. § 131.10(j) and (k). Furthermore, although the CWA does not require fisha-ble/swimmable use designations for all waters of the United States, the EPA clearly acted within the bounds of its statutory authority in creating the presumption to further the mandatory goals and purposes of the Act. Thus, the Court finds that the actions of the EPA in relying on the rebut-table presumption in this case were neither arbitrary and capricious nor an abuse of discretion.
 

 The Court also finds that the record supports the EPA’s determination that the presumption of aquatic life use attainability had not been rebutted with respect to the South Fork of the Coeur d’Alene and Canyon Creek. The data available to the EPA during the rulemaking was insufficient to demonstrate that fishable/swimma-ble uses are not attainable in those waters. Therefore, the Court will uphold the portions of the challenged rule designating the South Fork of the Coeur d’Alene and Can
 
 *1108
 
 yon Creek for cold water biota uses.
 
 [16]
 
 However, the Court is unable to uphold the EPA’s determination that the aquatic life use presumption had not been rebutted with respect to Shields Gulch where, the only data before the EPA indicated that there was no water in that stream segment to support aquatic life. Accordingly, that portion of the challenged rule designating Shields Gulch for cold water biota uses is vacated as arbitrary and capricious and is remanded to the EPA for further consideration consistent with the principles set forth herein.
 

 In light of the Court’s findings, Plaintiff Idaho Mining Association’s Motion for Summary Judgment is granted in part and denied in part; and Defendants’ Motion for Summary Judgment is granted in part and denied in part.
 

 ORDER
 

 Based on the foregoing, the Court being fully advised in the premises, IT IS HEREBY ORDERED that:
 

 (1) Plaintiff Idaho Mining Association’s Motion for Summary Judgment (Docket #16) is GRANTED IN PART and DENIED IN PART, as provided herein; and
 

 (2) Defendants’ Motion for Summary Judgment (Docket # 27) is GRANTED IN PART and DENIED IN PART, as provided herein.
 

 (3) That portion of the EPA rule designating Shields Gulch for cold water biota uses is VACATED as arbitrary . and capricious and is REMANDED to the EPA for further consideration in accordance with the principles set forth herein.
 

 [1]
 

 . In Idaho, a "point source” is defined as "[a]ny discernible, confined, and discrete conveyance ... from which pollutants are, or may be, discharged.” IDAPA. 16.01.02.003.76.
 

 [2]
 

 . The Idaho Department of Health and Welfare, Division of Environmental Quality (“IDEQ”) is the state agency responsible for developing and implementing state water quality standards in Idaho. Idaho Code § 39-105(3)(k).
 

 [3]
 

 . A UAA is defined by the implementing regulations as a “structured scientific assessment of the factors affecting the attainment of the use which may include physical, chemical, biological and economic factors ...” 40 C.F.R. § 131.3(g).
 

 [4]
 

 . Other disapproval issues included Idaho’s default use designation for unclassified surface waters, temperature criteria, Idaho’s an-tidegradation and mixing zone policies and a private waters exclusion. (IWQS 00024).
 

 [5]
 

 . The EPA also established cold water biota use designations for the Blackfoot River and Soda Creek. However, Plaintiff and its members do not challenge the use designations for those water bodies in this case.
 

 [6]
 

 . Plaintiff asserts that the biological, chemical and economic data which the EPA had at its disposal clearly demonstrated that aquatic life uses are not attainable in the affected waters. This aspect of Plaintiffs argument will be discussed in more detail at Section III.B.,
 
 infra.
 

 [7]
 

 . At the hearing, Plaintiff’s counsel indicated for the first time that Plaintiff is not actually challenging the EPA’s 1983 regulations at 40 C.F.R. § 131.10Q) and (k). However, to the extent Plaintiff argues that the EPA exceeded its statutory authority in creating a rebuttable presumption based on those regulations, the Court finds that Plaintiff's challenge to the presumption is equivalent to a challenge to the regulations themselves.
 

 [8]
 

 . The FWPCA was comprehensively amended in 1972, as codified at 33 U.S.C. § 1251,
 
 et seq.
 
 However, section 303 of the amendments “continued the use of existing state standards that [were] consistent with the applicable requirements of the 1965 Act.”
 
 Train, 9
 
 Env’t Rep. Cases at 1563. Specifically, Section 303(a)(2) provides in part:
 

 Any State which, before October 18, 1972, has adopted, pursuant to its own law, water quality standards applicable to intrastate waters shall submit such standards to the Administrator within thirty days after October 18, 1972.
 
 Each such standard shall remain in effect ... unless the Administrator determines that such standard is inconsistent with the applicable requirements of this Act as in effect immediately prior to October 18, 1972.
 

 33 U.S.C. § 1313(a)(2) (emphasis added).
 

 [9]
 

 . In its reply brief, Plaintiff cites several cases for the proposition that the EPA cannot enlarge its authority under section 303(c)(2)(A) of the CWA by relying on the statutory goals and purposes set forth in section 101(a)(2).
 
 See Rodriguez v. United States,
 
 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987);
 
 Boise Cascade Corp. v. United States EPA,
 
 942 F.2d 1427 (9th Cir.1991);
 
 National Wildlife Fed’n v. Gorsuch,
 
 693 F.2d 156, 177 (D.C.Cir. 1982);
 
 Association of Am. Railroads v. Costle, 562
 
 F.2d 1310, 1316 (D.C.Cir. 1977). However, as Defendants point out, Plaintiff’s argument ignores section 303(c)(2)(A) of the CWA which expressly provides that water quality standards must be established taking into consideration the purposes of the Act.
 

 [10]
 

 . For purposes of the Executive Order, a regulatory action is "significant” if,
 
 inter alia,
 
 it is one that will "have an annual effect on the economy of $100 million or more.” 58 Fed.Reg. 51,735 (Oct. 4, 1993).
 

 [11]
 

 . EPA’s variance procedure at 40 C.F.R. § 131.33(d) is another method by which water quality criteria may be adjusted to reflect local conditions without affecting the intended level of protection of a particular water body. Pursuant to this procedure, the Regional Administrator is authorized to grant individual NPDES permit holders variances from water quality standards where the permit holder demonstrates that certain conditions render attainment of the standards infeasible.
 
 See
 
 40 C.F.R. § 131.33(d)(3). However, the variance applies only to the permit holder requesting the variance; and the underlying water quality standard remains in effect. 40 C.F.R. § 131.33(d)(1).
 

 [12]
 

 . The fact that the State of Idaho is currently barred by the National Toxics Rule from adopting site-specific criteria is not relevant to the issue at hand, i.e. whether the EPA was obligated under the CWA and its own regulations to consider the adoption of site-specific criteria in connection with the challenged rule. Moreover, the fact that the EPA chose to promulgate site-specific temperature criteria for bull trout in another portion of the rule does not necessitate a finding that the EPA was required to do the same with respect to the fishable/swimmable use designations for the surface waters at issue; for the preamble to the EPA’s 1982 proposed regulations make clear that the development of site-specific criteria is not “necessary for every water quality standard review.” 47 Fed.Reg. at 49240.
 

 [13]
 

 . Plaintiff and its members do not specifically challenge the reasonableness of the EPA’s decision to designate the affected waters for cold water biota use as opposed to other aquatic life uses such as warm water biota or salmonoid spawning. However, it should be noted that the Idaho’s own water quality standards presume that cold water biota is an appropriate use designation for all undesig-nated waters in Idaho unless relevant data demonstrates otherwise.
 
 See
 
 IDAPA 16.01.02.101.01.a ("Because the [IDEQ] presumes most waters in the state will support cold water biota and primary or secondary contact recreation beneficial uses, the Department will apply cold water biota and primary or secondary contact recreation criteria to undesignated waters .... ”).
 

 [14]
 

 . Plaintiff argues that the EPA's alleged "scientific determination” was nothing more than a conclusoiy statement upon which the EPA relied to avoid its obligation to conduct an analysis of the factors affecting the attainability of the aquatic life use in the South Fork. However, Plaintiffs argument once again incorrectly presupposes that the EPA was required to affirmatively gather and evaluate data to justify the cold water biota use designation for the South Fork.
 

 [15]
 

 . In their opening brief, Defendants argued that Plaintiff lacked standing to challenge the federal use designation as to Shields Gulch because, to Defendants’ knowledge, none of Plaintiff's members hold NPDES permits for discharges into Shields Gulch. However, Defendants were apparently in error. On June 1, 1999, Luke Russell, Vice President of Coeur Environmental, Inc. ("Coeur”), submitted a sworn affidavit in which he stated that Coeur is one of Plaintiff’s members and that it is subject to a General NPDES permit which authorizes discharges into Shields Gulch.
 
 (.See
 
 Russell Affidavit, Docket # 40). Therefore, the standing issue has been resolved.
 

 [16]
 

 . It should be noted that the Court's ruling with respect to the South Fork of the Coeur d’Alene and Canyon Creek does not foreclose Plaintiff’s members and other individual NPDES permit holders from applying for variances from the cold water biota use designations established by the challenged rule,
 
 see
 
 40 C.F.R. § 131.33(d); nor does it preclude the State of Idaho from reevaluating the water quality standards and conducting a UAA to justify less protective use designations in the future.