**KANSAS NATURAL RESOURCE COUNCIL, INC. and Sierra Club, Plaintiffs,**

v.

**Christine T. WHITMAN, William W. Rice, and the United States Environmental Protection Agency, Defendants.**

**No. CIV.A. 00–2555–GTV.**

United States District Court, D. Kansas.

March 31, 2003.

Charles M. Benjamin, Lawrence, KS, John M. Simpson, Kansas City, MO, for Plaintiffs.

Christopher Allman, Office of United States Attorney, Kansas City, Brian H.

Lynk, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

This case involves claims by Plaintiffs Kansas Natural Resource Council, Inc. and Sierra Club that Defendant United States Environmental Protection Agency ("EPA") has failed to promulgate water quality standards for the State of Kansas within the time period established by the Clean Water Act, 33 U.S.C. § 1251 et seq. The key issue remaining in the case is whether 33 U.S.C. § 1313(c)(4) requires that the court order immediate promulgation of water quality standard regulations by the EPA, or whether the court has the discretion to order continued adherence to a long-term phased schedule of establishing water quality standards that the EPA and the State of Kansas have developed.

Both Plaintiffs and Defendants have moved for summary judgment (Docs. 13 and 15). For the following reasons, the court grants Plaintiffs' motion (Doc. 13) with the modifications noted in this Memorandum and Order. Defendants' motion (Doc. 15) is denied in part and granted in part. The court orders Defendants to take final action in accordance with 33 U.S.C. § 1313(c)(4) within ninety days of the date of this Memorandum and Order.

## I. STATUTORY AND REGULATORY BACKGROUND

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the reduction and eventual elimination of water pollution. 33 U.S.C. § 1251(a). This goal is to be accomplished partially through the use and enforcement of "water quality standards." *Id.* § 1313. Under 33 U.S.C. § 1313(c), states are responsible for developing,

adopting, and maintaining intrastate and interstate water quality standards. *Scott v. City of Hammond,* 741 F.2d 992, 994 (7th Cir.1984). States must designate a use for each body of water and determine the level of water quality necessary to support such use. 33 U.S.C. § 1313(c)(2)(A). In developing water quality standards, states must consider water bodies' "use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and ... their use and value for navigation." *Id.*

■ 33 U.S.C. § 1251(a)(2) guides states to seek "wherever attainable, ... water quality which provides for the protection and propagation of fish, shellfish and wildlife and provides for recreation in and on the water." In other words, the Clean Water Act has a goal of achieving "fishable/swimmable" waters, or in Kansas, waters that are designated for "primary contact recreation use," wherever possible. When a state designates a use for a water body that is less protective than statutory goals, it must conduct a "use attainability analysis," which is a "structured scientific assessment of the factors affecting the attainment of the use which may include physical, chemical, biological, and economic factors," 40 C.F.R. § 131.3(g), that shows that the statutory goals are unattainable, 40 C.F.R. § 131.10(i), (j). Essentially, there is a rebuttable presumption that water quality standards should be protective of the fishable/swimmable use the statute seeks to achieve. *Idaho Mining Ass'n v. Browner,* 90 F.Supp.2d 1078, 1097–98 (D.Idaho 2000).

The EPA's role is to "review[ ] a water quality standard promulgated by a State to ensure that it 'protect[s] the public health or welfare, enhance[s] the quality of water and serve[s] the purposes of [the Clean Water Act].'" *Scott,* 741 F.2d at 994–95

(quoting 33 U.S.C. § 1313(c)(2)(A)) (some alterations in original). If the EPA determines that a state-promulgated water quality standard is unacceptable, the EPA must notify the state of the deficiencies and give it an opportunity to correct the standard. 33 U.S.C. § 1313(c)(3). If the state does not correct the deficiencies within ninety days of notification, the EPA must prepare and publish its own proposed water quality standard. *Id.* § 1313(c)(4)(A). The EPA must then promulgate a new or revised water quality standard within ninety days of publishing it, "unless prior to such promulgation, [the] State has adopted a revised or new water quality standard which [the EPA] determines to be in accordance with [the Clean Water Act]." *Id.* § 1313(c)(4).

If the EPA fails to perform any of its nondiscretionary duties under the Clean Water Act, a private citizen may file suit to enforce the statute. *Id.* § 1365(a)(2). "The district courts shall have jurisdiction ... to order the [EPA] to perform such act or duty...." *Id.* § 1365(a).

## II. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are uncontroverted. Immaterial facts, facts regarding claims that are now moot, and facts not properly supported by the record are omitted.

The State of Kansas filed its water quality standards with the EPA for approval on October 31, 1994. On February 19, 1998, the EPA determined that a number of the water quality standards failed to comply with Clean Water Act requirements. On August 10, 1999, Kansas attempted to correct some of the disapproved water quality standards by submitting revisions. On August 23, 1999, Plaintiffs filed an action in this court, *Kansas Natural Resource Council, Inc., and Sierra Club v. EPA*, Case No. 99–

2373–JWL, to compel the EPA to publish proposed regulations to correct Kansas's deficient water quality standards. While the suit was pending, on January 19, 2000, the EPA approved some of the revised water quality standards submitted by Kansas. On May 19, 2000, Judge John W. Lungstrum entered a consent decree in which the EPA agreed to publish certain proposed regulations to correct the remaining deficient water quality standards. In accordance with the consent decree, the EPA published proposed water quality standard regulations on July 3, 2000.

Section 1313(c)(4) of the Clean Water Act requires that the EPA promulgate the regulations proposed on July 3, 2000 within ninety days after their proposal. If promulgated as final standards, these regulations would supersede the remaining deficient aspects of Kansas's water quality standards that the EPA rejected in 1998. Plaintiffs contend, and the EPA does not dispute, that the EPA failed to perform its nondiscretionary duty to promulgate the regulations it proposed on July 3, 2000 by October 1, 2000, as required by the Clean Water Act. Plaintiffs are now asking the court to compel the EPA to finalize and promulgate the regulations proposed on July 3, 2000.

Only one group of deficient water quality standards remains to be corrected. The remaining deficiency involves 1,456 water bodies that Kansas has tried to designate for the use of "secondary contact recreation," which is wading. However, Kansas failed to provide any use attainability analyses supporting the lower use designation. The EPA's proposed regulations would designate all 1,456 water bodies for primary contact recreation use.

The EPA contends that because its July 2000 proposed water quality standards generated a high level of interest in Kan-

sas from various groups, it increased the number of public hearings on the proposal and extended the public comment period beyond the ninety-day statutory period for promulgation to ensure that interested citizens and stakeholders in Kansas were given ample opportunity to comment. The agency has received over 2,000 separate comments on the proposal in addition to the oral testimony given at the public hearings. Most of the comments were critical of the EPA's proposed primary contact recreation use designation for the 1,456 water bodies. The EPA contends that these comments may indicate that a primary contact recreation use designation is inappropriate for many of the 1,456 water bodies. As a result of these comments and the information reviewed thus far, the EPA believes that the most appropriate course of action is to perform use attainability analyses on each of the 1,456 water bodies.

On March 26, 2001, the Kansas Department of Health and Environment and the EPA entered into a Memorandum of Understanding that set a schedule to correct the remaining deficiencies addressed by the EPA's July 2000 proposal. Under the Memorandum of Understanding, Kansas agreed to perform use attainability analyses for the 1,456 water bodies. The use attainability analyses and resulting modification proposals, if any, are due under a phased schedule with annual deadlines ending on July 14, 2006. The State of Kansas has already completed the field work for 230 use attainability analyses, which exceeds the 200 due under the first phase of the Memorandum of Understanding schedule.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the nonmoving party. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

## IV. DISCUSSION

### A. Clean Water Act Claim

The outcome of Plaintiffs' claim under the Clean Water Act hinges on whether

Congress has limited the court's options for review. Plaintiffs contend that this case is simple: Because Defendants failed to promulgate the regulations regarding the 1,456 bodies of water within ninety days as required by 33 U.S.C. § 1313(c)(4), the court must order immediate promulgation. Plaintiffs specifically ask the court to order that the EPA "finalize its actions in regard to the regulations within 30 days after the date of the court order and that EPA within 10 days after completion of its final actions submit the final regulations to the Federal Register for publication." Defendants maintain that the court retains the discretion to determine the most appropriate course of action. Specifically, Defendants ask the court to enter an order consistent with the schedule they have devised in the Memorandum of Understanding. After reviewing the plain language of the relevant statutes, the purpose behind the Clean Water Act, and case law considering similar questions, the court determines that Congress has limited its power and that the court must order relatively immediate final action by Defendants in accordance with 33 U.S.C. § 1313(c)(4).

### 1. Plain Language of Statutes

The EPA has a nondiscretionary duty under the Clean Water Act to "promulgate any revised or new standard ... not later than ninety days after [the EPA] publishes such proposed standards, unless prior to such promulgation, [the] State has adopted a revised or new water quality standard which the [EPA] determines to be in accordance with [the Clean Water Act]." 33 U.S.C. § 1313(c)(4). Under the plain language of the statute, the EPA must take final action with respect to proposed water quality standards within ninety days of publishing such standards. The EPA is relieved of its duty only if the state corrects the problem(s) with its water quality standards before the EPA promulgates its own standards.

When the EPA fails to perform its duty and a party sues under 33 U.S.C. § 1365(a)(2), Congress has granted the district courts jurisdiction, in relevant part, "to order the [EPA] to perform such act or duty...." *Id.* § 1365(a). The statute does not give the district court any other remedial options in a case where the EPA has neglected its duties under 33 U.S.C. § 1313(c)(4). Had Congress intended that courts exercise the equitable jurisdiction they generally possess, it would not have limited the courts' options for relief.

■ The court recognizes that it must not "lightly assume" that Congress has intended to curtail its equitable jurisdiction. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). However, "Congress may 're-strict[ ] the court's jurisdiction in equity' by making injunctive relief mandatory for a violation." *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1187 (10th Cir.1999) (quoting *Weinberger,* 456 U.S. at 313, 102 S.Ct. 1798). The court concludes that Congress has unambiguously limited the court's equitable jurisdiction in this instance. The court only has jurisdiction to order the EPA to perform its duty, which is to take final action in accordance with 33 U.S.C. § 1313(c)(4). The court therefore orders the EPA to take such action within ninety days of the date of this Memorandum and Order.

■ Plaintiffs argue that the court must order the EPA to promulgate standards reflecting *all* of the standards proposed by the EPA in July 2000, regardless of whether Kansas has made any corrections in the interim. Under 33 U.S.C. § 1313(c)(4), the court determines that Plaintiffs' rationale is flawed. The plain language of the statute indicates that the EPA is relieved of its duty if promulgation of its standards is no longer necessary. Furthermore, the

doctrine of mootness prohibits the court from ordering promulgation of regulations regarding waters for which the EPA has already approved water quality standards, to the extent such waters exist. Under the mootness doctrine, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Horstkoetter v. Dep't of Pub. Safety,* 159 F.3d 1265, 1276–77 (10th Cir.1998).

### 2. Purpose Behind the Clean Water Act

The court's statutory construction analysis is consistent with the goals of the Clean Water Act and the rebuttable presumption created in its regulations. The purpose of the Clean Water Act is, wherever attainable, to provide water quality that is fishable/swimmable. 33 U.S.C. § 1251(a)(2). Kansas has failed to show that a fishable/swimmable designation is not attainable with respect to the 1,456 waters. Unless and until unattainability is demonstrated as specified by the regulations, the purpose of the Clean Water Act is best served by protecting the waters as if they are fishable/swimmable.

Defendants argue that because the numerous comments received after the EPA published its proposed regulations indicate that a fishable/swimmable designation is not attainable with respect to many of the 1,456 waters, the court's interpretation would not be consistent with the purpose of the Clean Water Act. The court disagrees. Congress delegated the responsibility of drafting regulations to establish procedures to implement the Clean Water Act to the EPA. The EPA has promulgated such regulations. Defendants' position ignores the regulations' rebuttable presumption that all water bodies are to be given fishable/swimmable designation unless a state can demonstrate that such designation is not attainable. In its July 3,

2000 Federal Register Notice, the EPA explained the importance of the rebuttable presumption:

> EPA believes that the rebuttable presumption policy reflected in these regulations is an essential foundation for effective implementation of the CWA as a whole. The "use" of a water body is the most fundamental articulation of its role in the aquatic and human environments, and all of the water quality protections established by the CWA follow from the water's designated use. If a use lower than a CWA section 101(a) goal use is designated based on inadequate information or superficial analysis, water quality-based protections that might have enabled the water to achieve the goals articulated by Congress in section 101(a) may not be put in place. As a result, the true potential of the water body may never be realized, and a resource highly valued by Congress and the public may be forever lost.

Water Quality Standards for Kansas, 65 Fed.Reg. 41221 (proposed July 3, 2000). Once Kansas properly demonstrates that the presumption has been rebutted with respect to particular water bodies, it may seek to remove the fishable/swimmable, or primary contact recreation, designation.

### 3. Relevant Case Law

Although the court has not found any cases that address the precise issue in the instant case, it has considered the approach taken by two cases and their progeny: *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) and *Forest Guardians v. Babbitt,* 174 F.3d 1178 (10th Cir.1999). Defendants argue that the court should apply the reasoning of *Weinberger,* and Plaintiffs argue that the court should follow *Forest Guardians.* The court determines that the situation presented in *Forest Guardians* is more analogous to that of the instant case,

and therefore follows the reasoning of *Forest Guardians*.

In *Weinberger*, the plaintiffs brought suit under 33 U.S.C. § 1365(a)(1), the citizen suit provision of the Clean Water Act that allows citizens to sue a party other than the EPA who is violating an "effluent standard or limitation," which includes discharging pollutants without a National Pollutant Discharge Elimination System permit. 456 U.S. at 308–09 (citing 33 U.S.C. §§ 1311(a), 1323(a)). Federal courts have jurisdiction to enforce effluent standards or limitations just as they have jurisdiction to order the EPA to perform duties under the Clean Water Act. 33 U.S.C. § 1365(a). In a case brought to enforce effluent standards or limitations, the court may order relief in several forms: it may enforce the effluent standard or limitation, and/or it may "apply any appropriate civil penalties under section 1319(d) of this title." *Id.* Section 1319(d) provides for civil penalties for several Clean Water Act violations, but not for violations of 33 U.S.C. § 1313, which is the statute at issue in the instant case. In an effluent standards/limitations case, criminal penalties may also be appropriate. *Id.* § 1319(c).

The plaintiffs in *Weinberger* sued the Navy because it was discharging ordnance into the water surrounding Puerto Rico, where the Navy was engaging in training exercises, without first obtaining a permit. 456 U.S. at 307–08, 102 S.Ct. 1798. The plaintiffs sought to enjoin the Navy's operations in Puerto Rico. *Id.* at 307, 102 S.Ct. 1798. The Supreme Court held that the Federal Water Pollution Control Act—which was amended in 1972 by the Clean Water Act—did not require a district court to enjoin immediately all discharges of pollutants violating the permit requirements. *Id.* at 306–07, 102 S.Ct. 1798.

The Supreme Court began by reiterating its position that injunctive relief should be used sparingly and with discretion. *Id.*

at 311–12, 102 S.Ct. 1798. It then noted that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to issue an injunction for every violation of law." *Id.* at 313, 102 S.Ct. 1798. The Court quoted its prior ruling in *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946):

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Id.*

The Court distinguished the *Weinberger* facts from the facts in *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), where it had held that an injunction preventing the completion of the Tellico Dam was necessary to preserve the snail darter, an endangered species. 456 U.S. at 313–14, 102 S.Ct. 1798. In *TVA*, the "purpose and language of [the Endangered Species Act, 16 U.S.C. § 1531 et seq.,] not the bare fact of a statutory violation, compelled that conclusion.... The statute ... contains a flat ban on the destruction of critical habitats." *Id.* at 314, 102 S.Ct. 1798. The Court also noted that in *TVA*, only injunctive relief could fulfill the objectives of the Endangered Species Act. *Id.*

In contrast, the Court observed that multiple remedies were available to ensure compliance with the Federal Water Pollution Control Act in *Weinberger*—an injunction, civil fines, and/or criminal penalties. *Id.* Furthermore, the Court noted that the purpose of the Federal Water Pollution Control Act was not to protect the integrity of the permit process, but to protect the

integrity of the Nation's waters. *Id.* In discussing the permit system, the Court stated, "[t]hat the scheme as a whole contemplates the exercise of discretion and balancing of equities militates against the conclusion that Congress intended to deny courts their traditional equitable discretion in enforcing the statute." *Id.* at 316, 102 S.Ct. 1798. The Court also found it persuasive that the statutory scheme of the Federal Water Pollution Control Act is a scheme of phased compliance:

> Although the ultimate objective of the FWPCA is to eliminate all discharges of pollutants into the navigable waters by 1985, the statute sets forth a scheme of phased compliance. As enacted, it called for the achievement of the "best practicable control technology currently available" by July 1, 1977, and the "best available technology economically achievable" by July 1, 1983. 33 U.S.C. § 1311(b). This scheme of phased compliance further suggests that this is a statute in which Congress envisioned, rather than curtailed, the exercise of discretion.

*Id.* After consideration of these factors, the Court determined that Congress did not intend to require the district court to enjoin every act in violation of the permit requirements of the Federal Water Pollution Control Act:

> We do not read the FWPCA as foreclosing completely the exercise of the court's discretion. Rather than requiring a district court to issue an injunction for any and all statutory violations, the FWPCA permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation.

*Id.* at 320, 102 S.Ct. 1798.

In contrast to *Weinberger*, the Tenth Circuit in *Forest Guardians* determined that the Administrative Procedure Act deprived the court of the discretion to excuse violations of the Administrative Procedure Act by a government agency claiming that funding shortages prevented its compliance with the deadlines established by the Endangered Species Act. 174 F.3d at 1184. In *Forest Guardians*, the United States Department of Interior had missed its deadline for designating a critical habitat under the Endangered Species Act by three and one-half years. *Id.* at 1182. The agency claimed that it lacked the fiscal resources to make the designation. *Id.* It had established a priority system for eliminating a backlog caused by funding shortages, and critical habitat determination was placed in the third tier of the three-tier hierarchy. *Id.* at 1183–84, n. 9. The agency argued that the priority system served the Endangered Species Act's "overarching purposes"—"maximizing species protection and reversing the trends of extinction." *Id.* at 1184 (citation and internal quotation marks omitted).

The Tenth Circuit disagreed, and held that the district court lacked the discretion to stay the case until the agency procured the necessary funding because the statute set a date-certain deadline for agency action. *Id.* at 1190. Congress took away the court's equitable discretion when it drafted the Administrative Procedure Act's language that "[t]he reviewing court shall … compel agency action unlawfully withheld." *Id.* at 1187–89 (quoting 5 U.S.C. § 706(1)). The Tenth Circuit held that " '[s]hall' means shall. The Supreme Court and this circuit have made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." *Id.* at 1187. The court then determined that because the agency had not complied with the statutory deadline, the agency's action had been "unlawfully withheld," requiring a court order compelling agency action. *Id.* at 1191. The Tenth Circuit remanded the case to the district court "with instructions to or-

der the Secretary to issue a final critical habitat designation ... as soon as possible, without regard to the Secretary's other priorities under the ESA." *Id.* at 1193. The Tenth Circuit recognized, however, that "any order now to impose a new deadline for compliance must consider what work is necessary to publish the final rule and how quickly that can be accomplished." *Id.*

Plaintiffs assert that *Weinberger* is distinguishable for several reasons: (1) it did not involve a mandatory statutory deadline that was violated; (2) in *Weinberger*, the injunction sought was not the only available remedy; and (3) the plaintiffs in *Weinberger* were seeking to limit the *future activities* of the defendants. Defendants assert that *Forest Guardians* is distinguishable for several reasons: (1) it involved the Administrative Procedure Act rather than the Clean Water Act; (2) the district court that was reversed in *Forest Guardians* did not evaluate two alternative proposals for injunctive relief—rather, it declined to enter any injunctive relief at all; and (3) in *Forest Guardians*, the court faced a situation in which no progress in affording environmental protection could take place unless and until the federal agency took action. Defendants also argue that part of the Tenth Circuit's *Forest Guardians* opinion actually supports their position; the Circuit recognized that since the statutory deadline had already passed, the district court would have to consider "what work [was] necessary to publish the final rule and how quickly that [could] be accomplished." *Id.* at 1193.

The court has examined both cases closely and determines that the analysis in *Forest Guardians* is more applicable to the instant case. In particular, the court finds it persuasive that *Weinberger* addressed a situation where other remedies were available. Here, Congress gives the court only one option. The *Weinberger* court emphasized the availability of multiple remedies as a factor indicating that Congress did not intend to limit the Court's discretion.

*Weinberger* also did not address the violation of a specific statutory deadline. Instead, the case revolved around discharge of ordnance that would be permissible if the Navy obtained a permit. There was no date certain by which the Navy was required to obtain a permit. In the instant case and in *Forest Guardians*, the agencies failed to comply with specific statutory deadlines established by Congress. As the *Forest Guardians* court stated, "[W]hen Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion." *Id.* at 1190.

The court does not find it significant that *Forest Guardians* was decided under the Administrative Procedure Act rather than the Clean Water Act. The court recognizes that the Clean Water Act does not contain the strong language "the reviewing court shall ... compel agency action" that the Administrative Procedure Act contains. See 5 U.S.C. § 706(1). However, as previously explained, the language in the Clean Water Act is equally limiting with respect to the court's jurisdiction in a case where the EPA has failed to promulgate regulations within the ninety-day deadline.

### 4. Equitable Considerations

The court acknowledges that Defendants offer several other arguments why the court should order a schedule consistent with the Memorandum of Understanding. Most of those arguments are equitable arguments. Because the court has concluded that Congress has limited its ability to weigh any equitable factors, it will not address those arguments. The court will note, however, that it has considered Defendants' position that the court should

follow a line of cases that have approved lengthy schedules for establishing "total maximum daily loads." The cases cited by Defendants are not binding authority and are distinguishable from the case at hand. Notably, they were not decided in the Tenth Circuit, where the law of *Forest Guardians* serves as guidance.

### 5. Conclusion

In summary, the court orders Defendants to take final action in accordance with 33 U.S.C. § 1313(c)(4) within ninety days of the date of this Memorandum and Order. The court realizes that this order may result in bodies of water being given a primary contact recreation designation when a use attainability analysis might rebut such a designation. However, the court determines that the plain language of the Clean Water Act limits the options of the court. The court only has jurisdiction to order the EPA to perform its duties under the Clean Water Act. To remove the primary contact recreation designations, the State of Kansas should conduct the necessary use attainability analyses and resubmit proposed water quality standards to the EPA.

### B. Administrative Procedure Act Claim

Plaintiffs also seek relief under the Administrative Procedure Act. Defendants moved for summary judgment on the claim, arguing that the court lacks jurisdiction over the claim. Plaintiffs have conceded that the court should grant summary judgment on this claim. Because Plaintiffs have abandoned their Administrative Procedure Act claim, the court grants Defendants' motion with respect to this claim.

### C. Attorney Fees

Finally, Plaintiffs claim that they are entitled to attorney fees and costs as provided under 33 U.S.C. § 1365(d). The statute provides, "The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines that such award is appropriate." 33 U.S.C. § 1365(d).

Neither party has briefed this issue. The court declines to consider it until such time as Plaintiffs file a proper motion pursuant to Fed.R.Civ.P. 54(d) and applicable local rules.

IT IS, THEREFORE, BY THE COURT ORDERED that Plaintiffs' motion for summary judgment (Doc. 13) is granted with the modifications noted in this Memorandum and Order. Defendants' motion for summary judgment (Doc. 15) is denied in part and granted in part. Defendants are ordered to take final action in accordance with 33 U.S.C. § 1313(c)(4) within ninety days of the date of this Memorandum and Order.

The case is closed.

Copies of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**